AM INTERNATIONAL, INC., Plaintiff,

v.

INTERNATIONAL FORGING
EQUIPMENT, et al.,
Defendants.

No. C88–2037.

United States District Court,
N.D. Ohio, E.D.

June 29, 1990.

John Watson, Gardner Carton & Douglas, Chicago, Ill., Ronald S. Okada, Baker & Hostetler, Cleveland, Ohio, for plaintiff.

Robert W. McIntyre, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

This matter comes before the court on motion of the remaining defendants in this case, Euclid Industrial Center (EIC), International Forging Equipment Corp. (IFE), and Robert T. Dziak (Dziak), for summary

judgment. The relationship between the parties began in 1979, when plaintiff AM International, Inc. (AMI) decided to do a sale and partial leaseback of property it had owned in Euclid, Ohio, for some years. The portion of the property leased back contained its plant, where AMI had, *inter alia*, a machine shop and plating, heat-treating, and painting operations. The purchaser of the property was D & B Realty, of which Dziak and Donald Diemer (Diemer) are co-owners. On December 30, 1981, the obligations of D & B to AMI were assumed by Dziak, doing business as EIC.

In 1982, AMI announced that it would cease operations at the Euclid facility when its lease ran out in the fall. After the close of operations, on October 19, 1982, AMI entered into an asset purchase agreement with IFE, another of Dziak's corporate incarnations. IFE agreed to buy certain of AMI's assets, "as is, where is," including the plating and painting operations. The contractual relationship between AMI and EIC, Dziak, Diemer and D & B Realty, culminated in April 1984, pursuant to an agreement under which EIC paid AMI $2.3 million as accord and satisfaction, and AMI gave a release of all claims to EIC and Dziak.

In 1986, the Ohio Environmental Protection Agency (OEPA) notified Dziak that remedial action was necessary to clean up toxic wastes at the Euclid Industrial Center. Dziak refused to undertake the clean-up. OEPA then requested AMI to clean up the site. AMI hired Huff & Huff, Inc. (H & H) to do the clean-up, for which AMI paid H & H just over $350,000.

AMI then brought suit against D & B Realty, EIC, IFE, Dziak and Diemer. AMI here makes two claims: one for contribution under the Comprehensive Environmental Response, Compensation & Liability Act, 42 U.S.C. section 9601 *et seq.* (1987) (CERCLA), and one for unjust enrichment and quasi-contractual damages, state-law causes of action. Defendants joined H & H as a third-party defendant, and counterclaimed for breach of the lease agreement, damage to their property by AMI and H & H, and indemnification pursuant to the re-

lease agreement. A voluntary dismissal has been entered as to D & B and Diemer.

The above facts are uncontested. The further set of facts which AMI sets forth in its exhibits, and which we must accept for purposes of this motion for summary judgment, are as follows. AMI states that when it abandoned the premises, it left not only equipment, but also certain chemicals used in the painting and plating processes, at the insistence of Dziak. AMI left the chemicals in proper storage vessels, and under proper storage conditions.

The facilities began to deteriorate after AMI's departure. A portion of the roof caved in, and some flooding occurred on several occasions. AMI admits that the chemicals which it left behind were hazardous chemicals, but states that no clean-up would have been necessary were it not for the negligent care which was taken of the chemicals following its departure.

AMI also states that not all of the waste which it cleaned up was the result of negligent care of its chemical-storage facility. It is uncontested that some of the waste was in drums labelled "Yamalube," suggesting that it belonged to a subsequent tenant of the property, Yamaha. AMI contends that other amounts of waste were also generated by subsequent tenants.

I. Summary Judgment

Summary judgment is appropriate "[w]here the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see* Fed.R. Civ.P. 56(c). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted).

*McKee v. Cutter Laboratories, Inc.,* 866 F.2d 219, 220 (6th Cir.1989).

## II. CERCLA

AMI's federal cause of action seeks contribution from defendants for its remedial actions at the Euclid site. CERCLA, enacted hastily in the closing weeks of the 96th Congress, was intended to fund and provide enforcement mechanisms for the clean-up of property containing environmental hazards. In view of the often multi-million dollar cost of cleaning up environmentally-contaminated property, Congress cast an exceedingly broad, strict-liability net. The scope of CERCLA liability serves to encourage private remedial initiative as to existing sites, to discourage careless disposition of toxic wastes, and not least to ensure the vigilance of those whose proximity to generators of toxic substances creates the potential for liability, who also occupy the most advantageous positions from which to monitor these entities. CERCLA section 107(a) details the scope of liability:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
> (1) the owner and operator of a vessel or a facility,
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport or disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a

> release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable
>
> . . . .

42 U.S.C. § 9607(a) (1987). This section is further broadened by the definitions given certain key terms. The defenses given by section 107(b) are as narrow as the liability provision is broad: act of god or war and the "third-party defense," none of which are applicable here. 42 U.S.C. § 9607(b) (1987).

The status of contribution actions under CERCLA was unclear after its enactment, but both joint and several liability and contribution for divisible harm were recognized in the courts as necessary elements to the accomplishment of the congressional objectives. *See, e.g., United States v. Chem–Dyne Corp.,* 572 F.Supp. 802 (S.D. Ohio 1983). The Superfund Amendments and Reauthorization Act of 1986 (SARA) added section 113(f)(1) of CERCLA, which confirms and details the statutory right of contribution:

> Any person may seek contribution from any other person who is liable or potentially liable under section 107(a), during or following any civil action under section 106 or under section 107(a). Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 106 or section 107.

42 U.S.C. § 9613(f)(1) (1987). Defendants advance the following arguments against contributing.

## III. Releases Under CERCLA

■ Defendants EIC and Dziak separately contend that AMI is barred from bringing suit against them under federal or state law by a release of all claims given by

AMI pursuant to the April 1984 agreement resolving the relationship between these parties. AMI agreed in this document to release "any and all [claims] of every kind and description, known or unknown, in law or in equity, which AMI now has or may hereafter have against" EIC and Dziak, *inter alia.*

Movants incorporate by reference the arguments in favor of the release put forward in the prior motion for summary judgment filed by Diemer and D & B Realty in this case.[1] The incorporated discussion sets out a number of cases from Ohio state courts supporting the validity of releases generally, according to their terms.[2] On the question of the validity of the release under CERCLA, EIC and Dziak rely upon *Mardan Corp. v. C.G.C. Music, Ltd.,* 600 F.Supp. 1049 (D.Ariz.1984), *aff'd in part,* 804 F.2d 1454 (9th Cir.1986). AMI contends that the release was not intended to encompass unforeseen environmental issues, and also that it was not intended to apply to Dziak personally.

Courts are divided on the effect of releases under CERCLA. CERCLA section 107(e) provides that:

(1) No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

(2) Nothing in this title, including the provisions of paragraph (1) of this subsection, shall bar a cause of action that

an owner or operator or any other person subject to liability under this section, or a guarantor, has or would have, by reason of subrogation or otherwise against any person.

42 U.S.C. § 9607(e) (1987). On its face, this section is internally inconsistent. The legislative history of the provision, however, sheds light on Congress' meaning. The Senate added the following provision to a draft of the bill:

No indemnification, hold harmless, conveyance, or similar agreement shall be effective to transfer from the owner or operator of a facility, or from any person who may be liable for a release under this section, to any other person the liability imposed under this section: *Provided,* That this subsection shall not apply to a transfer in a bona fide conveyance of a facility or site (1) between two parties not affiliated with each other in any way, (2) where there has been an adequate disclosure in writing ... of all facts and conditions (including potential economic consequences) material to such liability, and (3) to a transferor who can provide assurances of financial responsibility and continuity of operation consistent with the degree and duration of risks associated with such facility or site.

S. 1480, 96th Cong., 2d Sess., 126 CONG.REC. 30,900 (1980). The provision as initially conceived, therefore, disfavored releases except under strict conditions.

The above draft was then amended again by the Senate to read as it now does. During the ensuing Senate debate on these amendments, the following exchange took place between Senator Cannon and Senator Randolph, a sponsor of the bill:

---

1. AMI contends that there is no precedent for such incorporation. Fed.R.Civ.P. 10(c) provides, however, that "[s]tatements in a pleading may be adopted by reference in ... another pleading or in any motion." Fed.R.Civ.P. 7(b)(2) further provides that "[t]he rules applicable to ... matters of form of pleadings apply to all motions," and Rule 10 is entitled "Form of Pleadings." It would therefore seem that 7(b)(2) contemplates incorporation between motions also, unless the court orders otherwise.

2. EIC & Dziak also cite to Ohio cases holding that the interpretation of a contract such as the release is a question of law. This court does not, however, incorporate state law as the rule of decision for purposes of distinguishing between questions of fact and law. *Byrd v. Blue Ridge Rural Elec. Coop.,* 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), *Herron v. Southern Pacific Co.,* 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857 (1931).

Mr. CANNON. Section 107(e)(1) prohibits transfer of liability from the owner or operator of a facility to other persons through indemnification, hold harmless, or similar agreements or conveyances. Language is also included indicating that this prohibition on the transfer of liability does not act as a bar to such agreements, in particular to insurance agreements.

The net effect is to make the parties to such an agreement, which would not have been liable under this section, also liable to the degree specified in the agreement. It is my understanding that this section is designed to eliminate situations where the owner or operator of a facility uses its economic power to force the transfer of its liability to other persons, as a cost of doing business, thus escaping its liability under the act all together.

Mr. RANDOLPH. That is correct.
126 CONG.REC. 30,984 (1980). Senator Cannon's construction suggests a means of construing section 107(e) coherently. The first sentence transformed a section which made a hold-harmless, conveyance, or similar agreement not effective, except under prescribed circumstances, to a section which absolutely prohibits the effectiveness of any such agreement to relieve a party from liability, but with a single exception recognizing agreements that may provide for indemnity or additionally liable parties. The second sentence does not relieve a party of liability but recognizes contracts providing for additional contractual liability. In sum, Congress intended subsection 107(e)(1) to prevent the parties from contractually relieving themselves of liability under the act, whether that liability is enforced by action of the government or in a suit by a person who performed the clean-up and sues others for contribution under the act. In addition, by the second sentence, Congress intended to permit any person to contract with others not already liable under the act to provide additional liability by way of insurance or indemnity.

This conclusion is supported by subsection 107(e)(2), which specifically directs that subsection 107(e)(1) does not bar causes of action by a person liable under the act or his guarantor against any other person for subrogation or contribution.[3] Since the second sentence of subsection 107(e)(1) authorizes a limited right to contract regarding liability, and since subsection 107(e)(2) expressly directs that such contracts may not limit suits against persons liable under the act, the inescapable conclusion is that such contracts cannot be enforced to prevent suits between tortfeasors under the act.

This reading of the section also comports with CERCLA policy. While the statute's primary policy is the encouragement of clean-up initiative on the part of responsible parties, a secondary policy is the equitable apportionment of costs in the aftermath. A secondary policy that permitted defenses to contribution of this kind would undercut the primary policy of encouraging clean-up initiative. Parties would be less likely to take the initiative if a mutual release were in effect among them, since the release would confine the costs to any party which acted.

Several courts confronted with indemnification or release agreements to date have, with minimal discussion, found explicit support for allotment of CERCLA liability by contract in the provision. *Versatile Metals, Inc. v. Union Corp.*, 693 F.Supp. 1563, 1573 (E.D.Pa.1988); *Chemical Waste Mgt. v. Armstrong World Indus.*, 669 F.Supp. 1285, 1294–1295 (E.D.Pa.1987); *FMC Corp. v. Northern Pump Co.*, 668 F.Supp. 1285, 1289 (D.Minn.1987), *appeal dismissed*, 871 F.2d 1091 (8th Cir.1988). This construction of the provision, however, renders nugatory the first sentence of subsection 107(e)(1).

Those courts which have recognized a contradiction in section 107(e) have attempted to resolve the problem by holding that the first sentence of subsection 107(e)(1) voids contractual arrangements as

**3.** The legislative history also indicates that subsection 107(e)(2) was intended to support contribution suits. The present, more explicit contribution provision was subsequently added by the SARA amendments in 1986. 126 CONG. REC. 31966 (1980).

a defense in a suit brought by the government, while the second sentence applies to private suits for contribution. *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1459 (9th Cir.1986); *Central Ill. Pub. Serv. Co. v. Indus. Oil Tank*, 730 F.Supp. 1498, 1507 (W.D.Mo.1990); *Southland Corp. v. Ashland Oil, Inc.*, 696 F.Supp. 994, 1000 (D.N.J.1988). This court's reading of the provision supports the former contention, but as to the latter, would only give effect to contracts binding parties otherwise not liable, to indemnify or insure liable parties.

The above discussion demonstrates that section 107(e) forbids giving effect to releases between tortfeasors in CERCLA contribution suits, therefore defendants' reliance on the release given by AMI is misplaced. Accordingly, plaintiff's federal contribution claim must proceed to trial.

### IV. Release of the State Law Claim

■ AMI's pendent state law claims are barred by the release, and summary judgment is proper as to this issue. State law controls the choice of law for a federal court sitting in diversity. *Klaxon Co. v. Stentor Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). "In Ohio, the validity of a release is to be determined by the law of the place where it was made and is to be performed...." *American Druggists' Ins. Co. v. Equifax, Inc.*, 505 F.Supp. 66, 68 (S.D.Ohio 1980) (citation omitted). Ohio law therefore controls the efficacy of the release for purposes of the state law claim.

As defendants point out, anticipatory releases are valid under Ohio law. *See id.*, and cases cited therein. Plaintiff offers *Isroff v. Westhall Co.*, No. 88-7-2368 (Ohio Ct.App. Feb. 21, 1990) for the proposition that "general language of release will not encompass claims of which the releasor was unaware." Both *Isroff* and the other Ohio case cited by plaintiff, *Sloan v. Standard Oil Co.*, 177 Ohio St. 149, 203 N.E.2d 237 (1964), however, are in keeping with Ohio law's application of the parol evidence rule to written releases. *American Druggists' Ins.*, 505 F.Supp. at 68; *Cleveland,*

*C.C. & St. L.R. Co. v. Green*, 126 Ohio St. 512, 186 N.E. 365 (1933); *Cassilly v. Cassilly*, 57 Ohio St. 582, 49 N.E. 795 (1897). The parol evidence rule bars evidence of oral understandings among the parties contradicting the terms of a written agreement, except where fraud or mutual material mistake are shown, or where the language of the contract is ambiguous. *Isroff* was a case of ambiguity. In *Sloan*, evidence of mistake had been shown.

There is no question of ambiguity or mistake in the present release. The language of the release, quoted above, is sweeping, but hardly ambiguous. Every conceivable cause of action is covered—all claims known and unknown, present and future, were released by AMI.[4] Since AMI has not produced any evidence which suggests that this court should lift the parol evidence bar, it may not introduce evidence contradicting the plain language of the release.

### V. Unclean Hands

■ Defendants assert that the doctrine of unclean hands bars AMI from pursuing either CERCLA or unjust enrichment claims, as both are equitable. On the issue of an unclean hands defense under CERCLA, defendants again raise *Mardan Corp. v. C.G.C. Music*, 600 F.Supp. 1049 (D.Ariz. 1984), *aff'd in part*, 804 F.2d 1454 (9th Cir.1986). As plaintiff points out, the opinion of the district court in *Mardan* has been strongly criticized. *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 90 (3d Cir.1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989); *Allied Corp. v. Acme Solvents Reclaiming, Inc.*, 691 F.Supp. 1100, 1119 (N.D.Ill.1988); *Chemical Waste Management v. Armstrong World Indus.*, 669 F.Supp. 1285, 1291 n. 7 (E.D.Pa.1987). The Ninth Circuit's affirmance of the district court in *Mardan* did not reach the merits of the unclean-hands issue. However, the panel stated in a footnote:

---

**4.** The release is also unambiguous on the subject of Dziak. It expressly discharges "Robert T.

Dziak, aka and dba Euclid Industrial."

The government argues that the "unclean hands" defense, as applied by the district court, would effectively eviscerate a federal common law right of contribution under CERCLA. While we know of no appellate court decision on point, most district courts that have faced the issue have interpreted section 107 of CERCLA to impose, as a matter of federal law, joint and several liability for indivisible injuries with a correlative right of contribution. The commentators have also concluded that a federal right of contribution attends CERCLA.

*Mardan,* 804 F.2d at 1457 n. 3 (citations omitted). This argument has even stronger force now that the statute has been amended to provide for an explicit right of contribution. Contribution, as the Ninth Circuit's footnote implies, presupposes tortfeasor-plaintiffs, therefore there would be no contribution if this defense were recognized. Furthermore, CERCLA section 107(a) states that the *only* defenses in CERCLA are those listed in section 107(b). *United States v. R.W. Meyer, Inc.,* 889 F.2d 1497, 1507 (1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990). While plaintiff's fault is not a defense, however, it is a factor which a court may consider in following the statutory dictate to equitably apportion amounts paid in contribution.[5]

## VI. The Sale of Assets

■ Defendant IFE contends that no chemicals were included in the list of assets which it purchased, and therefore it is not liable. Neither party has produced any portion of the list of assets which accompanied the asset purchase agreement. AMI contends "whether or not AMI can point to each of the items on the asset sale list, defendants, in fact, asserted ownership and control" over the chemicals.

The argument between the parties as to the ownership of the chemicals is not pertinent. Plaintiffs' complaint alleges that defendants are liable because they own or operate a "facility" under section 107(a).

Ownership of the *toxic wastes* is not an element of this claim. "Facility" is one of the defined terms which, as mentioned above, account in part for the breadth of CERCLA's liability. CERCLA section 101(9) defines a "facility" as a "building, structure, installation, equipment [or] ... storage container ... where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located...." 42 U.S.C. § 9601(9) (1987). Therefore, the undisputed fact that IFE owned a "facility" suffices for liability under subsection 107(a)(1). The circumstances under which the chemicals came to contaminate the site only address the issue of equitable apportionment of contribution.

Defendants rely upon *Southland Corp. v. Ashland Oil, Inc.,* 696 F.Supp. 994 (D.N.J.1988) for the proposition that liability cannot be transferred by an "as is, where is" clause such as the one in the IFE asset purchase agreement. This both misstates plaintiff's contention—that it left no toxic waste—and is inapposite, as the former owner in *Southland* was asserting the clause as a defense. The court did not address the liability of the *purchaser.*

Similarly, defendants offer *New York v. General Electric Co.,* 592 F.Supp. 291 (N.D.N.Y.1984), in which the court held that toxic waste liability could not be "sold." In *New York,* General Electric attempted to evade responsibility for selling oil containing toxic substances to a drag strip, which used it to lay dust, by arguing that it had not "disposed" of the toxic oil, but merely sold it, and that it was not responsible for the buyer's disposition of it. This case also involved the *seller's* attempt to evade responsibility, and does not deal with the purchaser. IFE is not entitled to summary judgment at this juncture.

## VII. Abandonment to EIC

■ Defendants assert that EIC's liability is predicated upon an agreement, the terms of which are not disputed, which provided that assets left behind by AMI

---

5. Defendants also assert that AMI's unclean hands act as a bar to its state law claims. In view of this court's decision concerning the va-

lidity of the release, this contention need not be addressed.

and not included in the list of assets purchased by IFE, were to become the property of EIC. This is not AMI's contention. As with IFE, AMI asserts that EIC is the "owner or operator" of a "facility" under section 107(a). As discussed above, EIC's CERCLA liability is not dependent upon its ownership of the toxic waste, but of the "facility" where the wastes "come to be located." 42 U.S.C. § 9601(9) (1978).

In addition to the *Southland* and *New York* cases which the court has discussed above, defendants cite *Midlantic National Bank v. New Jersey Department of Envtl. Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), for the proposition that toxic waste cannot be "abandoned." In *Midlantic,* the Supreme Court held that a trustee in bankruptcy may not abandon property containing an environmental hazard and therefore shed costly clean-up liability. On its face, the case is distinguishable because the holding dealt only with "abandonment" in bankruptcy. Second, CERCLA liability is not evaded by a person "abandoning" under the circumstances defendant alleges, so the reasoning of *Midlantic* is inapposite.[6] This issue raises the question of the circumstances under which the contamination occurred, which must be determined at trial, and therefore summary judgment is inappropriate.

### VIII. Procedural Issues

Defendants add a procedural prong to the attack in their reply brief, asserting that plaintiff's exhibits may not be considered by this court. Defendants assert that various documents are not properly authenticated, certified, or otherwise attested to. Defendants also state that the court may not consider portions of affidavits, but must consider them in their entirety. Defendants support these contentions by citing Fed.R.Civ.P. 56, and two cases from Ohio state courts.

Defendants' first contention finds support on the face of the rule. As to the second, however, defendants have the option of submitting pertinent omitted portions. The two Ohio cases cited by defendants do not guide a federal court's consid-

eration of the Federal Rules of Civil Procedure. Finally, defendants do not challenge the authenticity of any of these documents, only their conformity to procedural niceties.

In *Enquip, Inc. v. Smith–McDonald Corp.,* 655 F.2d 115 (7th Cir.1981), a case which the Sixth Circuit has cited with approval, *Hooks v. Hooks,* 771 F.2d 935, 945–6 (1985), the court held that procedural deficiencies in evidence advanced in opposition to a summary judgment motion do not prevent consideration of it.

> The burden is on the moving party to demonstrate the absence of [a genuine issue of material fact], and therefore all reasonable doubts are resolved in favor of the non-moving party. The non-moving party's defense to a motion for summary judgment is therefore liberally construed in terms of substance and of form....
>
> ....
>
> ... We find that the presence of this documentary evidence was sufficient to alert the court to the presence of an issue of material fact, even though it failed to conform to the formal requirements of Fed.R.Civ.P. 56(e).... The process of decocting should not eliminate matters before the court which show the existence of an issue of material fact.

*Id.* at 118–119. In addition, the advisory committee's note to Rule 56 states that "[t]he very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Plaintiff's exhibits clearly evidence disputed issues of fact. This court has not relied heavily upon the plaintiff's exhibits because, as discussed above, the parties proceeded on a misconception of the CERCLA cause of action.

■ Lastly, a motion to strike deficient affidavits is required, or the objection is waived. *Lacey v. Lumber Mut. Fire Ins. Co.,* 554 F.2d 1204, 1205 (1st Cir.1977). Since defendants have not moved to strike any of plaintiff's exhibits, because of the

---

6. *See* CERCLA section 107(a)(3), above.

particular facts of this case, and in view of the policies underlying summary judgment, this court will accept plaintiff's exhibits for what they are worth.

In view of the foregoing, summary judgment is GRANTED as to plaintiff's state law causes of action, and DENIED as to its CERCLA contribution action.