**HARLEY–DAVIDSON, INC., Plaintiff,**

v.

**MINSTAR, INC., AMF Incorporated, the United States of America, the United States Department of Defense, and the United States Department of the Navy, Defendants.**

No. 90–C–1245.

United States District Court,
E.D. Wisconsin.

Nov. 5, 1993.

Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C., Alice D. Seeger, Milwaukee, WI, for plaintiff.

Alice L. Mattice, U.S. Dept. of Justice, Environmental & Natural Resources Div., Washington, DC, James L. Santelle, Asst. U.S. Atty., U.S. Dept. of Justice, E.D. Wis., Milwaukee, WI, J. Andrew Schlickman, Sidley & Austin, Chicago, IL, David J. Edquist, Gibbs, Roper, Loots & Williams, S.C., Milwaukee, WI, for defendants.

### DECISION AND ORDER

RANDA, District Judge.

This case involves a dispute between Plaintiff, Harley–Davidson, Inc., ("Harley–Davidson"), and Defendants Minstar, Inc., ("Mins-

tar"), AMF, Inc., ("AMF"), U.S.A., U.S. Department of Defense, and the U.S. Department of the Navy (collectively, "the Navy"), over liability for clean-up of a contaminated industrial site. The dispute centers on two agreements [1] and a settlement in State Court arising from one of the agreements. Minstar and AMF assert that the Agreements effectively transferred liability and, hence, the cost of clean-up from Minstar and AMF to Harley–Davidson. Harley–Davidson acknowledges the Agreements, disputes their meaning, and argues that the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) negates Minstar–AMF's contractual transfer of liability. Harley–Davidson seeks recovery of its response costs under CERCLA, and a declaration of the liability of all parties under CERCLA and the two Agreements.

Minstar and AMF move the Court for judgment on the pleadings which, pursuant to a subsequent Order of Judge J.P. Stadtmueller, was transformed into a Motion for Summary Judgment. [2]

### FACTS

The genealogy for this industrial site is rather short, considering that it has been used as such since 1944. In 1944 the Navy took title to the industrial site in question now known as the York Facility. From 1944 to 1964, the Facility was operated as the York Naval Ordinance Plant. The United States sold the facility to AMF on January 31st, 1964. In 1980, AMF transferred the York Facility by a Quitclaim Deed to a wholly owned subsidiary, AMF York, Incorporated ("AMF York"). Paragraph Three of the 1980 Agreement provided that AMF York "shall assume and discharge and shall indemnify AMF Incorporated against all debts, liabilities and obligations without limitation

---

1. The two agreements are a 1980 Acquisition Agreement ("1980 Agreement") whereby AMF transferred all the assets and liabilities of its York Operation to AMF–York and a 1981 Purchase Agreement ("1981 Agreement") under which AMF sold its stock in AMF–York and related assets to Harley–Davidson.

2. This case was originally assigned to Judge J.P. Stadtmueller but later transferred to this Court.

After hearing oral argument on the motion for judgment on the pleadings, Judge Stadtmueller asked for supplementation of the record which resulted in the motions as they currently stand before the Court. Whether labeled a Motion for Judgment on the Pleadings or Motion for Summary Judgment is of no consequence as will be made clear from the ruling.

relating to AMF Incorporated's AMF York Division, its operations and products, whether known or unknown". On June 16, 1981, AMF transferred the Facility to Harley–Davidson. Minstar acquired AMF in 1985.

All three owners of the Facility, the Navy, AMF, and Harley–Davidson have performed manufacturing operations there. In 1986, Harley–Davidson conducted an environmental audit at the Facility and discovered environmental contamination. Since 1986, Harley–Davidson has responded to the contamination under the supervision of the Pennsylvania Department of Environmental Resources. Harley–Davidson alleges that the contamination at the Facility is attributable to the activities of the prior owners, operators and successors in interest (the Navy, AMF and Minstar).

Harley–Davidson filed this action pursuant to CERCLA Sections 107 and 113, 42 U.S.C. § 9607, 9613, naming the Navy, AMF, and Minstar as defendants. As previously indicated, Harley–Davidson seeks recovery of its response costs and a declaration of liability. An Amended Complaint was filed by Harley–Davidson containing an additional count against Minstar and AMF based on the Pennsylvania Hazardous Sites Cleanup Act. ("PAHSCA")[3]

While alleging that Harley–Davidson was responsible for the contaminated site, AMF and Minstar also alleged that they had discharged all of their obligations to Harley–Davidson for environmental contamination at the York Facility pursuant to the 1980 and 1981 Purchase Agreements.

Under the 1981 Agreement, AMF agreed to "retain and be responsible for the liabilities and obligations in respect of the related assets against and in respect of which AMF is indemnifying (Harley–Davidson) pursuant to Sec. 10.5(a)." 1981 Agreement, Sec. 2.2. The liabilities and obligations for which Harley–Davidson was indemnified included any loss, liability, or obligation in connection with AMF's liabilities "arising out of or resulting from an event or an occurrence ... due to non-compliance with any Federal, State, or local law, regulation, order or administrative or judicial determination relating to the environment ..." prior to transfer of the property to Harley–Davidson. 1981 Agreement Sec. 10.5(a)(1). These Agreements were the subject of the aforementioned State action brought by Harley–Davidson in Wisconsin State Court. *Harley–Davidson, Inc., v. Minstar, Inc.*, No. 90–CV–004063 (Milwaukee Circuit Court, Wisconsin, filed March 23, 1990), which has subsequently been settled.[4]

The 1980 and 1981 Agreements and the settlement of the State Court litigation are the basis for AMF's and Minstar's present motion. AMF and Minstar contend that the Agreements comprise Harley–Davidson's exclusive remedy against them for pre-acquisition environmental problems and that the settlement of the State Court action precludes Harley–Davidson's CERCLA action. In other words, AMF and Minstar argue that they have, as recognized potentially responsible parties under CERCLA, successfully transferred and satisfied the liability they may owe under CERCLA to Harley–Davidson, another potentially responsible party.

**3.** PAHSCA parallels CERCLA in general and, as argued by Minstar and AMF, is "virtually identical" to Sec. 107(e) of CERCLA. Interpretation of Sec. 107(e) of CERCLA is central to this decision.

**4.** Pursuant to this Settlement, Minstar agreed to pay $1,900,000 towards the investigation and clean-up work at the York Plant by April 15, 1991, and also agreed to pay the lesser of 60% of project costs or $125,000 for each successive calendar quarter (Settlement Agreement, ¶ 1–3). Minstar agreed to continue such payments until a total of all project costs paid by Minstar under the Agreement equals the lesser of $4,000,000 or 60% of final project costs (¶ 4). The parties stipulated that the payments under the Settle-

ment Agreement would satisfy all the relevant indemnity obligations of AMF and Minstar under the 1981 Purchase Agreement (¶ 5–7). The parties agreed to dismiss with prejudice all claims in the State Court action. *The parties also agreed that Minstar's and AMF's potential liabilities under CERCLA, if any, which were the only claims then pending in the Federal Court case would be resolved separate from the Settlement Agreement.* The Settlement Agreement provides that payments thereunder are a credit against any CERCLA liability. From the outset, AMF and Minstar have taken the position that Harley–Davidson's CERCLA claims are precluded by the 1980 and 1981 Agreements.

## ANALYSIS

■ Because the Court interprets Sec. 107(e) of CERCLA to preclude the contractual transfer of liability between parties responsible or potentially responsible for the clean-up of contaminated sites, Minstar and AMF cannot rely on the 1980 and 1981 Agreements or the State Court settlement arising therefrom to avoid any further liability it *may* have under the Statute.[5]

The conclusion that this Court reaches is considered the "minority" view. However, the Court accepts this view for the following reasons:

Although the stated purpose of CERCLA is clear some of its sections, in particular Sec. 107(e)(1), have been, judging from the amount of differing opinions, elusive in their meaning. The meaning of Sec. 107(e)(1) becomes readily clear, however, through an application of the language of the statute itself and the proper canons of statutory construction. Since the meaning of Sec. 107(e)(1) is discernable from these sources and is consistent with the objective of the law, there is no need to delve into its legislative history.[6] The primary guide for interpreting Sec. 107(e)(1), therefore, must be the language of Sec. 107(e)(1). "The law as it is

passed is the will of the majority of both houses, and the only mode in which that will is spoken is in the act itself ..." *Conroy,* —— U.S. at ——, 113 S.Ct. at 1567, quoting *Aldridge v. Williams,* 44 U.S. 9, 3 Howard 9, 24, 11 L.Ed. 469 (1844).

■ With this in mind, we look at the language of CERCLA. Under Sec. 107(a) there are four categories of potentially responsible parties. The current owner and operator of a contaminated site, the owner or operator of that site when contamination occurred, the generators of the waste sent to the contaminated site, and the transporters of the waste sent to the contaminated site.[7]

Sec. 107(e)(1) states:

**Indemnification, hold harmless, etc., agreements or conveyances; subrogation rights**

(1) No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for release or threat of release under this section to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure,

5. Depending on the total response costs, Minstar and AMF's current and obligated contributions may satisfy the liability that is ultimately attributed to them.

6. While the legislative history seems to support this Court's conclusion, it is ambiguous. "[N]ot the least of the defects of legislative history is its indeterminacy". *Conroy v. Aniskoff,* —— U.S. ——, ——, 113 S.Ct. 1562, 1567, 123 L.Ed.2d 229 (1993). Indeed, if we follow the direction of Justice Scalia in the concurring opinion in *Conroy,* we should not consider legislative history at all. "The greatest defect of legislative history is its illegitimacy. We are governed by laws, not by the intentions of legislators." *Id.*

7. Sec. 107(a) of CERCLA reads as follows: "Liability. (A) Covered Persons; scope; recoverable costs and damages; interest rate; "comparable maturity" date. Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—(1) the owner and operator of vessel or a facility, (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, (3) any person who by con-

tract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title." 42 U.S.C.A. § 9607(a) (Supp.1993).

hold harmless, or indemnify a party to such agreement for any liability under this section.[8]

42 U.S.C.A. § 9607(e)(1).

Taking up the first sentence of 107(e)(1), it is clear that the language proscribes *any* transfer "to any other person the liability imposed under this section".[9] This all-inclusive language precludes, *unless clarified elsewhere,* not only the transfer of "the liability imposed under this section" between potentially responsible parties, but the transfer between a potentially responsible party and a party not liable under the law.[10] Therefore, regardless of the nature of the liability imposed under this section, the transfer of that liability to "any other person" is proscribed. Courts considering only the first sentence are universal in their opinion that no other meaning could be drawn from this language. Standing alone, the first sentence is clear and unambiguous and draconian in its approach.

In turn, the second sentence of Sec. 107(e)(1), which by definition should be a qualifier of the lead first sentence[11] and therefore either explain or modify the first sentence, appears at first glance to contradict it. The second sentence of 107(e)(1) states:

Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C.A. § 9607(e)(1).

Some Courts have dealt with this apparent contradiction by reading the second sentence of 107(e) as a primary sentence, thereby permitting the transfer of liability between all parties and not just between potentially responsible parties. Reading the language of the second sentence in this manner permits the transfer of liability in all cases but it also, as a matter of course, negates the first sentence completely. In this it flies in the face of basic statutory and grammatical construction. Indeed, other Courts have dealt with this negation by simply ignoring the language of the first sentence altogether. *See e.g., Marmon Group, Inc. v. Rexnord, Inc.,* 822 F.2d 31 (7th Cir.1987); *Versatile Metals, Inc., v. Union Corporation,* 693 F.Supp. 1563 (E.D.Pa.1988); *FMC Corporation v. Northern Pump Company,* 668 F.Supp. 1285 (D.Minn.1987); *Mardan Corporation v. C.G.C. Music, Ltd.,* 804 F.2d 1454 (9th Cir.1986) (where Court *assumed* the right to contractually transfer liability between potentially responsible parties); *Rodenbeck v. Marathon Petroleum Co.,* 742 F.Supp. 1448 (N.D.Ind.1990) (where the provisions in question were essentially ignored).

The second sentence of Sec. 107(e)(1) cannot be read as other than a qualifier of the first sentence because statutory sections must be read to establish consistency with each other. Statutes should not be interpreted so as to render one part inoperative, superfluous, or insignificant. *In re Gasteiger,* 471 F.Supp. 13, 15 (E.D.Tenn. 1977). To give the second sentence independent meaning and/or to ignore the first sentence is to make the first sentence, which is

---

**8.** Subsection (e)(2) of Section 107 goes on to state: "Nothing in this subchapter, including the provisions of paragraph (1) of this subsection, shall bar a cause of action that an owner or operator or any other person subject to liability under this section, or a guarantor, has or would have, by reason of subrogation or otherwise against any person." 42 U.S.C.A. § 9607(e)(2).

**9.** The first sentence of Sec. 107(e)(1) contains the wording "liability imposed under this section". The second sentence of 107(e)(1) contains the wording "liability under this section." They obviously have the same meaning and may be interchanged.

**10.** As the Court in *Jones–Hamilton Company v. Kop–Coat, Inc.,* 750 F.Supp. 1022, 1025 (N.D.Cal.1990) stated, "the first sentence of Sec.

107(e)(1) appears to prohibit indemnification agreements under all circumstances ..." The *Jones* court went on to state, "... the second sentence of Sec. 107(e)(1) appears to permit indemnification under all circumstances". This is taken up *infra.*

**11.** Due to its position and language, the second sentence should be deemed a qualification of the first. It begins with the words "Nothing in this subsection ...", suggesting its use as a qualifying sentence and not as a lead or primary sentence. Indeed, to give the second sentence an independence from the first sentence, and thus primacy of meaning over the first sentence, goes against basic principles of composition, logic and statutory construction. *See e.g., In re Etchin,* 128 B.R. 662 (Bankr.W.D.Wis.1991) ("a qualifying phrase must be applied to words or phrases immediately preceding it").

an all inclusive lead sentence, truly "inoperative, superfluous and insignificant". *Id.* If inconsistency can be avoided or consistency achieved by one manner of reading the language of the statute, it should be done. All parts of the statute should be given affect. *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961).

Other Courts, in an attempt to reconcile the two sentences and observe the foregoing basic standards of statutory construction, have properly recognized the second sentence as a qualifier or modifier of the first. They have "squared" the language of the second sentence with that of the first by positing that the "liability imposed under this section" language contained in the first sentence of 107(e)(1) is a liability imposed by, and owed to, the U.S. Government. Thus, it is reasoned, as long as the liability owed to the Government is in no way diminished, the second sentence of this Section allows the transfer of the *costs of that liability* to another potentially responsible party. This interpretation, the reasoning continues, preserves the internal logic of the subsection, observes proper principles of statutory construction, and maintains the objective of the statute. For instance, the Court in *Niecko v. Emro Marketing Company,* 973 F.2d 1296 (6th Cir. 1992) relied heavily on legislative history and held:

> [T]he first sentence insures the clean-up is performed and those responsible cannot escape their liability for cleaning the property. However, in terms of *financial liability, the parties may allocate the costs of the clean-up between them* ... [T]his is a

more palatable and consistent interpretation ... because it allows the two sentences to be read as internally consistent.

*Id.,* at 1301. (Emphasis supplied.)

In addition, the 6th Circuit in *AM International, Inc., v. International Forging Equipment Corporation,* 982 F.2d 989 (6th Cir. 1993), again *relying on legislative history,*[12] specifically overturned the District Court which adopted the conclusions reached here. The Court stated that its reading of the statutory language, proposed first in *Niecko,*

> seems to us to make sense both in logic and *as a matter of public policy.*[13] The underlying purposes of the statutory language under scrutiny is to ensure that responsible parties will pay for the clean-up and that they may not avoid liability to the government by transferring this liability to another. However, this purpose is not inconsistent with parties responsible for the clean-up transferring or *allocating among themselves the costs associated with this liability* so long as they remain liable to the third party who can demand the clean-up. This is what is permitted by the second sentence—the shifting or allocation of the risk of the *cost of liability* between potentially responsible persons without diluting CERCLA liability for the clean-up itself.

*Id.,* at 994. (Emphasis supplied.)

Although correctly recognizing the second sentence as necessarily a qualifying sentence,[14] the foregoing analysis misinterprets the meaning given by the statute itself to the language "liability under this section". Sec-

---

12. For an example of the opposite conclusion suggested by *Niecko's* reading of legislative history, see 126 Cong.Rec. 30, 984 (1980) and an exchange between Senators Cannon and Randolph (a sponsor of the bill), wherein it was their understanding that contractual transfer of liability between potentially responsible parties was precluded. Indeed, this is apparently the *only* legislative history that discusses the seeming contradiction of the sentences.

13. The Court would note that effective public policy arguments can be made for both positions. See, for example, the District Court opinion in *AM International,* 743 F.Supp. 525 (N.D.Oh. 1990). The *AM International* Court determined that its interpretation of Sec. 107(e) was consis-

tent with the policy of galvanizing potentially responsible parties to rapidly clean up contaminated sites. In addition, see commentaries such as 75 Minn.L.Rev. 1571, wherein it is argued, among other things, that "national uniformity" is achieved by the District Court's position. On the other hand, see 43 Case Western Reserve L.Rev. 161, arguing that private risk allocation should be and would be encouraged by allowing the transfer of liability between potentially responsible parties.

14. As was stated in *AM International,* "the second sentence (of Sec. 107(e)(1)) provides an exemption which narrows the scope of the first". *AM International,* 982 F.2d at 995.

tion 107(a) defines that liability and clearly states that a potentially responsible party shall be liable for:

(A) all costs of removal or remedial action incurred by the United States Government . . .;

(B) any other necessary costs of response incurred by any other person. . . .

42 U.S.C.A. § 9607(a)(4)(A) & (B) (Supp. 1993). Thus, the very distinction cases like *Niecko* and *AM International* seek to draw between the liability owed to the Government and the liability owed to other responsible parties cannot be drawn because both are "liabilit[ies] imposed under this section" that cannot be transferred. The *Niecko* and *AM International* Courts, in seeking to transfer the "risk of the cost of liability" or the "costs associated with this liability" (*AM International*) or the "financial liability" or "costs of the clean-up" (*Niecko*) between potentially responsible parties, are really seeking to transfer the "response costs incurred by any other person", which is proscribed by Sec. 107(e)(1) and Sec. 107(a).

Thus, under a plain reading of the statute, the liability which cannot be transferred by a potentially responsible party under the first sentence of Sec. 107(e)(1) is a duty to contribute to the costs "incurred by the United States Government" or the "costs of response incurred by any other person". The phrase "liability imposed under this section" does not make a distinction between "financial liability" or the "costs of liability" and another liability owed to the Government. The liability owed is the cost that the Government or another party incurs in the way of response and other costs. Therefore, the "liability imposed under this section", and that

which *cannot* be contracted away to another potentially responsible party, are the very costs (incurred by the Government or any other person) that the majority view deems separate from a liability owed to the Government. The statute is clear as to what the non-transferrable liability is, and the language of the statute defining liability precludes the alternative suggested by the majority view.

Because the main thrust of Sec. 107(e)(1) is primarily to prevent the transfer of costs that a potential responsible party owes to the Government or another potential responsible party, the only question that remains is whether or not the phrase "to any other person" in the first sentence prevents the transfer of that liability to a non-potentially responsible party. Because the second sentence is read as a modifier of the first sentence (or as stated by *AM International* "narrows the scope of the first sentence", *supra*) and because it cannot and does not modify the definition of liability given in Sec. 107(a), it must modify and does modify the language "any other person" in the first sentence. Read this way, the second sentence permits the transfer of liability owed by a potentially responsible party to a non-liable or non-potentially responsible party, such as an insurance company.

The latter interpretation gives Sec. 107(e)(1) a greater consistency for it relies more completely on the language of the statute itself and not at all on "appropriate" public policy or inconclusive legislative history. It is also consistent with the strict liability nature of the statute [15] and is congruent with the narrow defenses allowed in any CERCLA action.[16] This interpretation also

15. CERCLA imposes a standard of strict liability. CERCLA Sec. 101(32), 42 U.S.C. Sec. 9601(32) states: "The terms "liable" or "liability" under this Subchapter shall be construed to be the *standard of liability which obtains under section* 1321 of Title 33 [the Clean Water Act]." Though not explicitly stated, Courts have concluded that a standard of strict liability prevails under the Clean Water Act. *U.S. v. Tex–Tow, Inc.*, 589 F.2d 1310 (7th Cir.1978).

16. Sec. 107(b) defenses: "There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or

threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—(1) an act of God; (2) an act of war; (3) an act or omission of a third party other than an employee or agent of the defendant, or then one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant . . . if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions

lends a consistency to Sec. 107(e)(2)[17] and is in keeping with the tenor of the Act that more parties rather than less should be held accountable.

For the foregoing reasons, the Court concludes that the first sentence of Sec. 107(e) precludes the use of any indemnification, hold harmless or similar agreement to contractually transfer the liability that one potentially responsible party owes to the Government or another potentially responsible party.

It further concludes that the second sentence of Sec. 107(e) permits indemnification, hold harmless and similar agreements between a potentially responsible party and a party not otherwise liable under Sec. 107(a).[18]

**NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1.   Minstar and AMF's motion to dismiss and motions for summary judgment are denied;

2.   The parties rights are declared as stated;

3.   Allocation of costs will be subsequently determined by the Court pursuant to Sec. 113 and other relevant standards in CERCLA.

**SO ORDERED.**

against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or (4) any combination of the foregoing paragraphs."

**17.**   See footnote 8, *supra*.

**18.**   Nothing in the second sentence expressly defines the term "party". However, as the Court discussed *supra*, because the second sentence is a "qualifying" sentence, it can only mean that a non-potentially responsible party can insure or hold harmless a potentially responsible party liable to the Government or another potentially responsible party.