**CPC INTERNATIONAL, INC., Plaintiff,**

v.

**AEROJET–GENERAL CORPORATION, Cordova Chemical Company, Cordova Chemical Company of Michigan, and Michigan Department of Natural Resources, Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**CORDOVA CHEMICAL COMPANY OF MICHIGAN, Cordova Chemical Company of California, Aerojet–General Corporation, CPC International, Inc., and Dr. Arnold C. Ott, Defendants.**

Nos. 1:89–CV–503, 1:89–CV–961.

United States District Court,
W.D. Michigan, S.D.

March 6, 1991.

Patrick J. Conlon, Roseland, N.J., J. Michael Smith, Gordon J. Quist, Miller, Johnson, Snell & Cummiskey, Grand Rapids, Mich., Randy M. Mott, Raissa Kirk, Robert T. Lee, Stephen E. Williams, Mott, Williams & Lee, P.C., Washington, D.C., William S. Wells, CPC Intern., Inc., Englewood Cliffs, N.J., David L. Harris, Robert Chesler, Alexander Kovacs, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, N.J., for CPC Intern., Inc.

John D. Tully, Warner, Norcross & Judd, Grand Rapids, Mich., for Aerojet–General Corp., Cordova Chemical Co. and Cordova Chemical Co. of Michigan.

Stewart H. Freeman, Asst. Atty. Gen., Frank J. Kelley, Atty. Gen., Environmental Protection Div., Kathleen L. Cavanaugh, Eric J. Eggan, Asst. Attys. Gen., Lansing, Mich., for Michigan Dept. of Natural Resources.

Michael L. Shiparski, Thomas J. Gezon, Asst. U.S. Attys., John A. Smietanka, U.S. Atty., Grand Rapids, Mich., Michael J. McNulty, Richard B. Stewart, U.S. Dept. of Justice, Environment & Natural Resources Div., Environmental Enforcement Section, Washington, D.C., Nicholas Bollo, Assoc. Reg. Counsel, Larry L. Johnson, Anne L. Alonzo, U.S. E.P.A., Region V, Chicago, Ill., John Fogarty, U.S. E.P.A., Enforcement & Compliance Monitoring Office, Gregory L. Sukys, U.S. Dept. of Justice, Environmental Enforcement Section, Environment and Natural Resources Div., Washington, D.C., for the U.S.

Charles M. Denton, Theresa M. Pouley, Jon F. DeWitt, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, Mich., for Dr. Arnold C. Ott.

Carole D. Bos, Kevin J. O'Dowd, Buchanan & Bos, Grand Rapids, Mich., Richard A. Fogel, William M. Savino, M. Paul Gorfinkel, Rivkin, Radler, Bayh, Hart & Kremer, Uniondale, N.Y., for Commercial Union Ins. Co.

Stanley A. Prokop, Plunkett & Cooney, P.C., Detroit, Mich., for Home Ins. Co.

Timothy F. Casey, Kohl, Secrest, Wardle, Lynch, Clark & Hampton, Farmington Hills, Mich., for Insurance Co. of State of Pennsylvania.

Peter B. Kupelian, Kirsten Kingdon, Tucker & Rolf, Southfield, Mich., Robert J. Bates, Jr., Phelan, Pope & John, Ltd., Chicago, Ill. for Zurich Ins. Co.

Lynn L. Lower, Kallas, Lower, Henk & Treado, Bloomfield Hills, Mich., for Affiliated FM Ins. Co.

Grant J. Gruel, Scott R. Melton, Gruel, Mills, Nims & Pylman, Grand Rapids, Mich., Irene A. Sullivan, Timothy G. Reynolds, Skadden, Arps, Slate, Meagher & Flom, New York City, for North Star Reinsurance Corp.

Reynolds A. Brander, Jr., Cholette, Perkins & Buchanan, Grand Rapids, Mich., for Intern. Ins. Co.

Randall E. Phillips, Marilyn A. Madorsky, Provizer, Lichtenstein, Pearlman & Phillips, P.C., Southfield, Mich., Sheldon Karasik, Peter M. Papasavas, Sheft & Sweeney, New York City, for Highlands Ins. Co.

Harrison C. Stackpole, Holahan, Malloy, Maybaugh & Monnich, Troy, Mich., for Mission Ins. Co.

Charles W. Browning, Vandeveer Garzia, P.C., Detroit, Mich., for Prudential Reinsurance Co. and Aetna Cas. and Sur. Co.

Gary A. Maximiuk, Wheeler, Upham, Bryant & Uhl, Grand Rapids, Mich., for Newington, Ltd.

James R. Nelson, Nelson & Kreuger, P.C., Carole D. Bos, Kevin J. O'Dowd, Grand Rapids, Mich., Richard A. Fogel,

William M. Savino, M. Paul Gorfinkel, Rivkin, Radler, Bayh, Hart & Kremer, Uniondale, N.Y., for Fireman's Fund Ins. Co.

William F. Jerome, State of New York Ins. Dept., New York City, for Allianz Versicherungs–AG and Midland Ins. Co.

Joel S. Huyser, Robert J. Dugan, Rhoades, McKee, Boer, Goodrich & Titta, Grand Rapids, Mich., Eileen B. Eglin, Stephen D. Straus, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, for Northwestern Nat. Ins. Co.

Charles N. Dewey, Jr., Dilley, Dewey & Damon, P.C., Grand Rapids, Mich., Paul R. Koepff, Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, for Insurance Co. of North America.

## OPINION

HILLMAN, Senior District Judge.

This consolidated action is brought under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq. (1988). The parties filed a total of eight summary judgment motions regarding liability under CERCLA for the cleanup costs at a now-dormant chemical plant in Dalton Township, Michigan ("the site"), which is on the Superfund list of hazardous waste sites that are a national priority. At the conclusion of a hearing on February 4, 1991, the court delivered a bench opinion denying all or part of five motions for summary judgment. The remaining motions or parts of motions are decided in this opinion.

### I. OVERVIEW

For nearly 30 years beginning in 1957, a series of companies used the site to produce a variety of chemicals. Since 1981, the federal Environmental Protection Agency ("EPA") has investigated how to remedy serious contamination problems that developed in the ground and water at the site and in surrounding areas due to hazardous waste disposal practices. In 1989, EPA selected the first phase of its remedial program for the site, and the claims in this consolidated action seek to

determine who should be liable for the past and future costs of this cleanup.

The parties involved in this action are the United States; Arnold C. Ott ("Ott"); CPC International, Inc. ("CPC"); Aerojet–General Corp. ("Aerojet") and two wholly-owned subsidiaries, Cordova Chemical Co. ("Cordova/California") and Cordova Chemical Co. of Michigan ("Cordova/Michigan"); and the Michigan Department of Natural Resources ("MDNR").

The court, in the February 4 bench opinion, held that genuine issues of material fact exist regarding the liability of Ott, CPC, Aerojet, Cordova/California, and MDNR under CERCLA provisions which, under certain circumstances, hold liable current and past owners or operators of sites polluted by hazardous wastes. *See* 42 U.S.C. § 9607(a)(1), (2).

The liability issues raised in the motions presently before the court arise under a separate theory of CERCLA liability and a different set of facts. The central question, raised in claims brought by CPC, is whether MDNR, Aerojet and Cordova/California are liable under section 107(a)(3) of CERCLA, which extends liability to those who arrange for disposal or treatment of hazardous substances. 42 U.S.C. § 9607(a)(3). In addition, there are related legal issues under CERCLA provisions dealing with the validity of releases and under pendent state claims.

## II. FACTUAL BACKGROUND

The factual scenario that raises the questions before the court began at the site in the mid–1970s. Story Chemical Co., which had purchased the site in 1972, became mired in economic problems and engaged in poor environmental practices. Chief among Story's environmental abuses was abandonment of a groundwater purging system, which caused the spread of hazardous substances further below the surface and beyond the site.

Serious contamination problems had developed at the site by this time, and MDNR became involved in having Story redress them in 1976 or 1977. In June 1976, however, Story filed for bankruptcy. There-

after, Story's compliance with MDNR's orders with respect to improved environmental practices at the site was, at most, incomplete and unsatisfactory. Story, which is not a party to this action, was adjudicated bankrupt in August 1977.

MDNR became involved in efforts to find a new buyer for the site. The widespread contamination at the site was a major issue in this pursuit. After at least one unsuccessful attempt at a deal with a company for the site, Aerojet and its Cordova Chemical Co. division (the unincorporated predecessor to Cordova/California) entered the picture. In March 1977, officials from Aerojet and its Cordova division met with MDNR officials in Michigan. After the meeting, the company initially elected not to acquire the property, due, in part, to its pollution problems.

Later in 1977, however, there was renewed interest in the site by Aerojet and its Cordova division as a possible facility for manufacture of a chemical that would soon not be available from a previous supplier. Talks between officials from MDNR and Aerojet and its Cordova division resumed.

The existing and spreading contamination at the site was central to the negotiations that began in the summer of 1977. The negotiations culminated in an October 13, 1977, stipulation and consent order signed by MDNR, Michigan's attorney general's office and Cordova Chemical Co. which had become separately incorporated (i.e., Cordova/California) on October 3, 1977. It should be noted that, although the document is entitled "stipulation and consent order," the parties were not involved in litigation, and no court approval of hazardous waste disposal practices was contemplated. On the day after the stipulation and consent order was signed, Cordova/California purchased the site from Story's bankruptcy trustee.

The four-page stipulation and consent order between MDNR and Cordova/California identified four central pollution problems emanating from the site: groundwater contamination, buried waste sludge,

toxic waste drums and containers, and contaminated residential wells. With respect to the groundwater problems, the stipulation stated that:

1. Groundwater beneath and surrounding Story Chemical Corporation for an unknown distance has been and is continuing to be contaminated with toxic chemical wastes which originated at the Story Chemical Corporation facility.

· · · · ·

5. There is continued leaching of toxic chemical wastes to the groundwaters of the State of Michigan as a result of the improperly disposed waste sludges buried on the site of Story Chemical Corporation.

Stipulation ¶¶ 1, 5.

The stipulation also identified three actions as "the most reasonable methods of abating the present pollution problems" at the site:

a) Disposal of the approximately 8,700 fifty-five gallon drums of solid and liquid chemical waste by the Department of Natural Resources by means of recovery, incineration or landfilling,

b) Excavation, removal and disposal of approximately 8,000 cubic yards of solid chemical waste, sludges and contaminated soils by the Department of Natural Resources, and

c) Neutralization, or sale, removal and disposal of the phosgene by Cordova Chemical Company.

Stipulation, ¶ 8.

Another section of the stipulation and consent order set forth obligations for MDNR and Cordova/California regarding cleanup at the site. In paragraphs 2 and 3 of the consent order, MDNR assumed responsibility for removing 8,700 fifty-five gallon drums and removing 8,000 cubic yards of solid waste, sludges and contaminated soils. In paragraph 4, Cordova/California assumed responsibility for the neutralization as well as the disposal or removal and sale of the phosgene gas at the site. The order also set deadlines for completion of these actions.

Under paragraph 5 of the consent order, Cordova/California agreed to pay $600,000 to MDNR "to abate the pollution problems at the Story Chemical property." The order set forth a schedule for the payments and made them contingent upon MDNR obtaining legislative and gubernatorial approval.

With respect to Cordova/California's additional responsibility or liability for the contamination at the site it was acquiring, the consent order stated:

6. .... Cordova Chemical Company shall not have any responsibility or liability in connection with any other corrective actions which the Department of Natural Resources or any other governmental agency may hereafter deem necessary or advisable in connection with the contamination emanating from the Story Chemical Corporation property, including, without limitation, the creation, maintenance and operation of any purge wells.

· · · · ·

8. Compliance with this Consent Order shall constitute full satisfaction of all relief, civil or administrative, which might have been, or which otherwise might be obtained against Cordova Chemical Company for any contamination of groundwaters or other pollution, injury, or damage, to the environment or otherwise, caused by acts or omissions of Story Chemical Corporation facilities, which acts, omissions or operations occurred prior to the effective date of this Consent Order, whether the contamination, pollution, injury or damage occurs prior to or after the effective date hereof.

· · · · ·

9. By entering this Order the Department of Natural Resources agrees to indemnify and hold Cordova Chemical Company Harmless from any and all losses, damages, injury, costs and expenses (including reasonable attorney's fees) incurred or sustained by Cordova Chemical Company on account of or in connection with the Department's excavation, removal and disposal operations

pursuant to paragraphs 2 and 3 of this Consent Order. This provision does not apply to losses, damages, injuries, costs and expenses caused by the willful or negligent acts of Cordova Chemical Company's employees or agents.

After the signing of the stipulation and consent order, a number of steps were taken to fulfill its terms. On February 6, 1978, Governor Milliken signed a Michigan senate bill appropriating $1.27 million in funds requested by MDNR for the site. The appropriation, which included the $600,000 paid to the state by Cordova/California in accordance with the consent order, allocated $500,000 for "barrel and sludge removal", $600,000 for "alternative water supply" and $170,000 for "new ground water purging system." Cordova/California neutralized the phosgene gas at the site and removed it. MDNR, with private contractors, removed sludge and drums of waste.

In contrast to these actions, however, groundwater contamination went largely unattended and worsened after the signing of the stipulation and consent order.

Although $170,000 in the state appropriations bill was earmarked for "new groundwater purging system," a new purge well system was not installed at the site. Following passage of the appropriations bill, an April 3, 1978, "special program directive" was issued by an MDNR official, designating as a "highest" priority the task of "removal of contaminated groundwater and installation of public water supply" at the site. The directive stated:

> Removal of contaminated groundwater will be continued without interruption until funds appropriated for this purpose are exhausted or until such time as the groundwaters are determined to be purged of the contamination resulting from the operations of the Story Chemical Company.

MDNR subsequently commissioned studies and evaluated various methods of treating the groundwater. But neither the state nor Cordova/California implemented a plan to remedy the groundwater problem, and the groundwater contamination continued to spread.

The claims presently before the court are premised on this factual background. CPC alleges that MDNR, Aerojet and Cordova/California entered into an arrangement for disposal or treatment by MDNR of the contaminated groundwater at the site. CPC asserts that this alleged arrangement, coupled with the subsequent spread of groundwater contamination, makes MDNR, Aerojet and Cordova/California liable under section 107(a)(3) of CERCLA for arranging for disposal or treatment of hazardous substances. CPC, MDNR and Aerojet have each moved for summary judgment on this claim.

Aerojet, Cordova/California and Cordova/Michigan have moved for summary judgment on separate grounds regarding the stipulation and consent order. They contend that the order precludes MDNR's CERCLA cross-claim against them and other parties' claims for contribution.

In addition, MDNR moves for summary judgment regarding state claims based on the stipulation and consent order, which Aerojet, Cordova/California and Cordova/Michigan have raised.

### III. STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The crux of summary judgment is determining whether the evidence presents a sufficient disagreement to require submission to a factfinder or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). In making this determination, the court must examine the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, drawing all justifiable inferences in favor of the party opposing the motions. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Kramer v. Bachan Aerospace Corp.,* 912 F.2d 151, 153–54 (6th Cir.1990). If the moving party demonstrates there is an absence of evidence supporting the non-moving party's case, the party opposing the motion must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *Kramer,* 912 F.2d at 153–54. To sustain this burden, the non-moving party cannot rest on the mere allegations of the pleadings. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; Fed.R.Civ.P. 56(e). Rather, the non-moving party must come forward with specific facts to support its claims and show there is a genuine issue for trial. *Id.* Nevertheless, the non-moving party is entitled to the benefit of all reasonable inferences. *Stratmore v. Goodbody,* 866 F.2d 189, 191 (6th Cir.), *cert. denied,* 490 U.S. 1066, 109 S.Ct. 2065, 104 L.Ed.2d 630 (1989).

## IV. CERCLA CLAIMS

### A. Liability under § 107(a)(3)

#### 1. CERCLA overview

■ There are four elements to prima facie CERCLA liability: 1) a release of hazardous substances must have occurred, 2) at a facility, 3) causing the plaintiff to incur response costs, 4) and the defendant must be a responsible party as defined under section 107(a), 42 U.S.C. § 9607(a). *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir.1989); *CPC International, Inc. v. Aerojet–General Corp.,* 731 F.Supp. 783, 786 (W.D.Mich.1989). None of the parties contest that the first three elements are met in this action.

CPC alleges that MDNR, Aerojet and Cordova/California satisfy the fourth element as responsible parties subject to liability, under section 107(a)(3), which holds responsible

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another party or entity and containing such hazardous substances ...

42 U.S.C. § 9607(a)(3). In simpler terms, section 107(a)(3) applies to those who arrange for disposal or treatment of hazardous substances at a facility. Liability under the statute applies to a number of entities, including corporations and states. *See Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989).

CERCLA broadly defines "disposal" so as to include "the discharge, deposit, injection, dumping, *spilling, leaking,* or placing" of any hazardous substance such that it "may enter the environment." 42 U.S.C. § 9601(29) (adopting definition in 42 U.S.C. § 6903(3)) (emphasis added). *See United States v. Aceto Agricultural Chemicals Corp.,* 872 F.2d 1373, 1379 (8th Cir.1989); *CPC,* 731 F.Supp. at 789. "Treatment" is also broadly defined to mean:

> any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous.... Such term includes any activity or processing designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous.

42 U.S.C. § 9601(29) (adopting definition in 42 U.S.C. § 6903(34)). The statute does not define "arrange," so CERCLA does not provide any further guidance regarding the meaning of "arranged for disposal or treatment" under section 107(a)(3).

Courts have generally recognized that section 107(a)(3) must be given a liberal interpretation to realize the statute's overwhelmingly remedial purposes. *See Florida Power & Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313, 1318 (11th Cir.1990); *Aceto,* 872 F.2d at 1380–81; *United States v. Northeastern Pharmaceutical & Chemical Co.,* ("*NEPACCO*") 810 F.2d 726, 733 (8th Cir.1986), *cert. denied,* 484 U.S. 848,

108 S.Ct. 146, 98 L.Ed.2d 102 (1987). "The courts have emphasized that, here as elsewhere, the statutory language should be construed expansively in order to give effect to congressional intent that all who participate in the generation and disposal of hazardous wastes should share in cleaning up the harm from their activity." 2 S. Cooke, *Law of Hazardous Waste* § 14.01[5][d][ii].

It is apparent that for a court to determine whether section 107(a)(3) liability attaches, then, it needs to engage in a fact-specific inquiry of the alleged arrangement for disposal of hazardous substances, similar to the case-by-case approach that is appropriate in determining the liability of corporate officers and parent corporations under section 107(a)(2).

### 2. *Liability of MDNR, Aerojet, Cordova/California*

 CPC's theory of liability under section 107(a)(3) is two-fold. First, it alleges an arrangement existed among MDNR, Aerojet and Cordova/California, as part of the Cordova/California acquisition of the site, to have MDNR eliminate the groundwater contamination through the installation of new purge wells. The "arrangement" is evidenced, CPC claims, by the stipulation and consent order and the negotiations that preceded it. Second, CPC notes that despite MDNR's alleged obligations to correct the groundwater problem, the contamination went unchecked and worsened after the arrangement. As a result, CPC argues, MDNR, Aerojet and Cordova/California are liable for having made an arrangement for disposal of hazardous substances at the site.[1]

MDNR, Aerojet and Cordova/California maintain there was no arrangement for disposal or treatment at the site. They assert that they could not have arranged for disposal as required by the statute because they lacked a nexus of ownership, possession or control to the contamination. They also contend that the spread of contaminated groundwater does not constitute "disposal" under CERCLA. In addition, MDNR contends it never agreed to run the purge wells, and Aerojet argues that it did not participate in the crucial negotiations regarding the stipulation and consent order between Cordova/California and MDNR that determined obligations for cleanup activities.

The court must determine whether any of the parties are entitled to summary judgment on the question of whether MDNR, Aerojet and Cordova/California arranged for the disposal of the contaminated groundwater.

### a. *Disposal*

 MDNR, Aerojet and Cordova/California contend that CPC's claim must fail due to the absence of evidence of "disposal" required in an arrangement for disposal of hazardous substances.

The parties do not dispute that groundwater contamination worsened in the period after the stipulation and consent order was signed and Cordova/California and MDNR initiated other cleanup activity at the site. Rather, they maintain that the migration of contaminated groundwater that occurred does not constitute disposal,

---

1. To the extent that CPC contends that an arrangement for disposal of hazardous substances other than groundwater contamination subjects the parties to liability in this case, the court rejects this argument as without merit. To be liable for the spread of groundwater contamination, MDNR, Aerojet and Cordova/California must have made an arrangement that specifically involved the groundwater contamination problem.

In a related matter, CPC, in its response to MDNR's motion for summary judgment on the section 107(a)(3) claim, points to evidence that MDNR punctured barrels of sludge, buried other barrels and failed to remove some sludge at the site, in addition to the undisputed evidence that groundwater contamination spread following the stipulation and consent order. However, CPC does not allege in its complaint or summary judgment motion that these incidents resulted in releases that provide a basis for section 107(a)(3) liability. Therefore, the court finds that CPC has failed to carry its burden of showing that MDNR and Cordova/California are liable under section 107(a)(3) due to these other incidents alone. The court considers the summary judgment issues related to section 107(a)(3) solely on the basis of groundwater contamination.

citing decisions that have narrowly construed the term. *See In re Diamond Reo Trucks, Inc.,* 115 B.R. 559, 565 (W.D.Mich. 1990); *Ecodyne Corp. v. Shah,* 718 F.Supp. 1454 (N.D.Cal.1989).

This legal argument was previously rejected by the court in the ruling on MDNR's motion to dismiss. *CPC,* 731 F.Supp. at 789. The definition of "disposal" adopted in CERCLA expressly includes "spilling" and "leaking." 42 U.S.C. § 9601(29) (adopting 42 U.S.C. § 6903(3)). Therefore, the unchecked spread of contaminated groundwater, which was identified in the stipulation and consent order as a problem existing at the site, qualifies as disposal.

This interpretation is consistent with the broad readings of "disposal" made by other courts. *See United States v. Waste Indus., Inc.,* 734 F.2d 159 (4th Cir.1984); *Emhart Indus., Inc. v. Duracell Int'l, Inc.,* 665 F.Supp. 549, 574 (M.D.Tenn.1987); *United States v. Price,* 523 F.Supp. 1055 (D.N.J.1981), *aff'd,* 688 F.2d 204 (3rd Cir. 1982).

*b. Nexus to the hazardous substances*

■ MDNR, Aerojet and Cordova/California also assert that CPC's claim must fail because they did not own, possess or have direct control over the contamination at issue. In short, the parties contend that they lack a nexus to the hazardous substances that is necessary to impose section 107(a)(3) liability for an arrangement for disposal of hazardous substances.

The court visited this issue as well in its prior ruling on MDNR's motion to dismiss. *CPC,* 731 F.Supp. at 789–90. After analyzing the cases addressing the question, the court stated that a party can have the necessary nexus to hazardous substances without actual ownership or possession. *Id. See NEPACCO,* 810 F.2d at 743; *United States v. Mottolo,* 629 F.Supp. 56, 60 (D.N.H.1984).

Instead, section 107(a)(3) requires the assumption of responsibility for or control over the disposition of hazardous waste. The nexus issue is not a test of whether a party created or left hazardous substances

or had title to them, but rather whether the party assumed responsibility for determining their fate. As the Eighth Circuit has stated, "It is the authority to control the handling and disposal of hazardous substances that is critical under the statutory scheme...." *NEPACCO,* 810 F.2d at 743.

In this case, CPC states a claim that alleges the necessary nexus between the parties and the hazardous substances. CPC alleges that MDNR, Aerojet and Cordova/California, in the negotiations and stipulation and consent order that preceded Cordova/California's acquisition of the site, agreed to have MDNR remedy the groundwater contamination problem. This allegation, if true, satisfies the nexus requirement of section 107(a)(3); by agreeing to a plan whereby MDNR would treat the groundwater, the parties assumed responsibility and control for the problems posed by this hazardous waste. The nexus requirement would be met for each of the parties involved in the agreement because of their shared responsibility in the crucial decision of how to address the contaminated groundwater problem. *See NEPACCO,* 810 F.2d at 743–44; *United States v. A & F Materials Co., Inc.,* 582 F.Supp. 842, 845 (S.D.Ill.1984).

Although MDNR allegedly became the party responsible for the groundwater contamination, Cordova/California and Aerojet would have shifted responsibility to MDNR for this problem at the site Cordova/California was acquiring. Evidence of such an agreement would be sufficient proof of the connection to the waste required under section 107(a)(3).

The parties' nexus to the groundwater contamination problem encompasses the same factual questions as the alleged arrangement itself, which the court addresses next.

*c. Arranged for disposal*

The liability of MDNR, Aerojet and Cordova/California under section 107(a)(3) turns on the question of whether an arrangement existed for disposal or treat-

ment of the contaminated groundwater problem that actually worsened.

█ Although the circumstances presented in this case are a matter of first impression, courts have made clear that section 107(a)(3) encompasses a wide range of arrangements. "Arranger" liability can apply to parties that did not generate the hazardous substances that were disposed. *United States v. Consol. Rail Corp.*, 729 F.Supp. 1461, 1469 (D.Del.1990); *B.F. Goodrich Co. v. Murtha*, 754 F.Supp. 960 (D.Conn.1991) (holding municipality could be liable under section 107(a)(3)) (text in Westlaw). It can also attach to parties that do not have active involvement regarding the timing, manner, or location of disposal. *Florida Power & Light*, 893 F.2d at 1318; *United States v. Ward*, 618 F.Supp. 884, 895 (E.D.N.C.1985); *Missouri v. Indep. Petrochemical Corp.*, 610 F.Supp. 4, 5 (E.D.Mo.1985); *New York v. General Electric Co.*, 592 F.Supp. 291, 297 (N.D.N.Y. 1984). Liability can apply to parties who simply sell off their hazardous substances in a transaction that is followed by contamination from those substances. *General Electric*, 592 F.Supp. at 297 (holding manufacturer who sold PCB-laced oil to drag strip could be liable); *United States v. Farber*, 17 Chem. Waste Lit. Rptr. 873, 875 (D.N.J.1989) (holding sale of business could be subject to liability "if there is a specific transaction concerning hazardous substances" that resulted in a release).

These broad interpretations of arrangements subject to liability are consistent with CERCLA's remedial goals. The statute clearly aims to place the burden of cleanups on the parties responsible for the problems. As the *General Electric* court noted in finding that a seller of used transformer oil could be liable under section 107(a)(3), "the legislative history of CERCLA makes clear that 'persons cannot escape liability by " ' "contracting away" ' " their responsibility or by alleging that the incident was caused by the act or omission of a third party.' " *Id.* (quoting S.Rep. No. 96–848, 96th Cong., 2d Sess. 31 (1980)). Similarly, the Eighth Circuit stated, in holding that manufacturers may be liable under

section 107(a)(3), "Any other decision ... would allow defendants to simply 'close their eyes' to the method of disposal of their hazardous substances, a result contrary to the policies underlying CERCLA." *Aceto*, 872 F.2d at 1382.

█ In light of the expansive interpretations given to CERCLA generally and to section 107(a)(3) in particular, it is clear to the court that the alleged agreement among MDNR, Aerojet and Cordova/California with respect to groundwater contamination, if proved, would be an arrangement for disposal that is subject to liability. Although none of the parties was initially responsible for creating the contamination at the site, MDNR, Aerojet and Cordova/California allegedly made an agreement in which MDNR would treat the problem and release Cordova/California of responsibility for it. By making such an arrangement, the parties would have become exposed to its consequences.

It is undisputed that the parties, in a series of negotiations, discussed terms and conditions of a cleanup at the site and signed a stipulation and consent order that induced Cordova/California to purchase the site. Under the stipulation and consent order, both MDNR and Cordova/California agreed to engage in cleanup activity, and Cordova/California agreed to pay the state $600,000 "to abate the pollution problems" at the site. The stipulation recognized the contamination of groundwater as one of four environmental problems at the site Cordova/California was acquiring.

If, as CPC alleges, MDNR agreed to remedy the groundwater contamination problem which worsened following the stipulation and consent order, the parties to that agreement are plainly accountable for having made an arrangement for disposal under section 107(a)(3). This result is consistent with other decisions recognizing that parties may be liable for arrangements that shift hazardous waste and its responsibilities to other parties and then result in disposal and contamination. *See, e.g., General Electric*, 592 F.Supp. at 297.

Any other conclusion regarding the parties' potential section 107(a)(3) liability

would clash with CERCLA's broadly remedial goals and remove the deterrence that section 107(a)(3) provides. The specter of parties not being liable for arrangements regarding hazardous substance disposal that result in further contamination might encourage private agreements that determine the fate of hazardous waste without careful attention to the arrangements' safety or success. CERCLA does not permit agreements that allegedly lead to disposal of hazardous substances to be made with impunity.

■ Although CPC's theory of liability is tenable, the court cannot grant summary judgment to any of the parties because genuine issues of material fact exist.

The principal fact issue over which a genuine dispute exists is the alleged arrangement itself. Credible evidence has been advanced by both sides regarding whether there was, in fact, an agreement that MDNR would assume responsibility for the groundwater contamination problem.

The stipulation and consent order that culminated the negotiations among the parties is silent as to any express obligation on the part of MDNR to treat the groundwater problem. The agreement between MDNR and Cordova/California stipulates that groundwater contamination is one of four central problems with hazardous waste at the site. But the consent order fails to prescribe any specific action with respect to groundwater. Under the consent order, MDNR expressly assumes responsibility for two of the other three problems, and Cordova/California assumes charge for the third. But a plan of action for groundwater contamination is absent. In identifying "the most reasonable methods of abating the present pollution problems," the document addresses the other three problems: waste drums, sludge and phosgene gas.

Evidence also exists beyond the stipulation and consent order that suggests the absence of an agreement with respect to plans for a groundwater cleanup. The Cordova/California official who signed the consent order acknowledged in deposition tes-timony that there was disagreement within the state regarding what was required for the groundwater problem. In addition, testimony has been offered from Cordova/California officials suggesting MDNR complied with its obligations under the consent order.

In contrast, evidence has been presented to the court that tends to support the existence of an agreement that MDNR would in fact clean up the groundwater problem. Under the terms of the consent order, MDNR accepted $600,000 "to abate the pollution problems" at the site and purported to relieve Cordova/California of "responsibility or liability for any other corrective actions ..., including, without limitation the creation, maintenance and operation of any purge wells." Soon after the signing of the stipulation and consent order, MDNR expressly received a $170,000 line-item appropriation from the Michigan legislature for a "new ground water purging system," although all of this money was spent on studies of the problem rather than implementation of a new system. The "special program directive" issued by MDNR made elimination of groundwater contamination a highest priority. In addition, Cordova/California officials have testified that responsibility for purge wells rested with the state.

Thus, a genuine issue exists for trial regarding whether the parties agreed to have MDNR assume responsibility for the groundwater contamination at the site that Cordova/California was acquiring or whether the fate of the contaminated groundwater was left unresolved. Only the former arrangement would subject the parties to section 107(a)(3) liability. If an agreement existed, as previously pointed out, sufficient proof will then have been established of the requisite nexus to the groundwater contamination problem and of an arrangement for disposal.

The conflicting evidence regarding the alleged groundwater contamination agreement alone mandates denial of summary judgment. However, additional disputes also exist that preclude summary judgment. These include questions regarding

whether Aerojet was a party to the alleged arrangement and whether MDNR's efforts to clean up the site were an emergency response entitled to immunity from liability under section 107(d)(2), a fact question that the court noted in the February 4 bench opinion.

Aerojet and its unincorporated Cordova division participated in initial negotiations regarding acquisition of the site and the terms of an agreement with MDNR regarding contamination. In early October 1977, Aerojet prepared a draft version of the consent order. However, Cordova/California was separately incorporated 10 days before the actual signing of the stipulation and consent order, and intensive negotiations took place during this interim. The stipulation and consent order was signed on behalf of "Cordova Chemical Company." Nevertheless, officials with MDNR have testified that the agreements, in fact, were made with Aerojet officials. Cordova/California officials have also testified to their confusion about the separate incorporation of the Cordova division and on whose behalf the stipulation and consent order were signed. As with the factual questions that exist regarding Aerojet's liability under section 107(a)(2) as a parent corporation, credible evidence exists upon which reasonable fact-finders could differ regarding whether Aerojet made the alleged arrangement.

### B. MDNR's CERCLA claims against Aerojet, Cordova/California and claims for contribution

■ In a separate motion for summary judgment, Aerojet, Cordova/California and Cordova/Michigan (collectively, "the Cordova defendants") seek dismissal of MDNR's cross-claim under CERCLA and all other claims for contribution due to provisions of the stipulation and consent order. They contend that the release and indemnification language contained in the consent order precludes MDNR's CERCLA claim against it and other parties' claims for contribution based on liability to MDNR.

In relevant parts, the consent order provides:

6. ... The Cordova Chemical Company shall not have any liability in the event that the said $600,000 is not in fact sufficient for the intended purposes.... Cordova Chemical Company shall not have any responsibility or liability in connection with any other corrective actions which the Department of Natural Resources or any other governmental agency may hereafter deem necessary or advisable in connection with the contamination emanating from the Story Chemical Corporation property, including, without limitation, the creation, maintenance and operation of any purge wells.

. . . . .

8. Compliance with this Consent Order shall constitute full satisfaction of all relief, civil or administrative, which might have been, or which otherwise might be obtained against Cordova Chemical Company for any contamination of groundwaters or other pollution, injury, or damage, to the environment or otherwise, caused by acts or omissions of Story Chemical Corporation facilities, which acts, omissions or operations occurred prior to the effective date of this Consent Order, whether the contamination, pollution, injury or damage occurs prior to or after the effective date hereof.

. . . . .

9. By entering this Order the Department of Natural Resources agrees to indemnify and hold Cordova Chemical Company Harmless from any and all losses, damages, injury, costs and expenses (including reasonable attorney's fees) incurred or sustained by Cordova Chemical Company on account of or in connection with the Department's excavation, removal and disposal operations pursuant to paragraphs 2 and 3 of this Consent Order. This provision does not apply to losses, damages, injuries, costs and expenses caused by the willful or negligent acts of Cordova Chemical Company's employees or agents.

Consent order, ¶¶ 6, 8, 9.

The Cordova defendants argue that the express terms of this consent order pre-

clude MDNR from bringing a CERCLA cross-claim against them as the present owners and operators of the contaminated site. *See* section 107(a)(1), 42 U.S.C. § 9607(a)(1). They characterize the order as an express release from all liability to MDNR for the contamination that was caused by the previous owners. Specifically, they point to the language in paragraph 8 that appears to relieve them from liability for pollution caused by the former owners that results in damage "prior to or after" the date of the consent order.

MDNR contends that the stipulation and consent order entered into in 1977 does not bar MDNR's claim against the Cordova defendants under CERCLA, which was adopted by Congress in 1980. MDNR asserts that parties may not contractually relieve themselves from CERCLA liability, particularly when the release was entered several years before CERCLA became effective.

Both the Cordova defendants and MDNR point to section 107(e) of CERCLA, which specifically addresses the effect of "hold harmless" agreements on liability. Section 107(e)(1) provides:

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any ... facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

The Cordova defendants rely on the second sentence of section 107(e)(1): "nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party...." They maintain that this language indicates that CERCLA expressly permits releases such as the one in the consent order. Indeed, some courts have found that releases and hold harmless agreements may serve to bar CERCLA claims. *See Versatile Metals, Inc. v. Union Corp.*, 693 F.Supp. 1563, 1573 (E.D.Pa.

1988); *Chem. Waste Management, Inc. v. Armstrong World Indus.*, 669 F.Supp. 1285, 1294 (E.D.Pa.1987); *FMC Corp. v. Northern Pump Co.*, 668 F.Supp. 1285, 1289–90 (D.Minn.1987).

MDNR argues that when both sentences of section 107(e)(1) are read together, it is clear that CERCLA actually bars releases that attempt to shift liability away from a responsible party. MDNR relies on *AM Int'l Inc. v. Int'l Forging Equip.*, 743 F.Supp. 525 (N.D. Ohio 1990). Actually, section 107(e)(1), MDNR contends, expressly prevents releases from applying to CERCLA liability.

In *AM International*, Judge Joiner noted that decisions that interpret section 107(e)(1) as expressly permitting the allotment of CERCLA liability by contract "render[ ] nugatory the first sentence." *Id.* at 529. In spare form, the first sentence of section 107(e)(1) states that "[n]o indemnification, hold harmless, or similar agreement ... shall ... transfer ... liability imposed under" CERCLA. This bar against the use of releases for CERCLA liability can be reconciled with the second sentence of section 107(e)(1) by reading the latter as giving "effect to contracts binding parties otherwise not liable, to indemnify or insure liable parties." *AM Int'l*, 743 F.Supp. at 530.

This reading of section 107(e)(1) appears to contradict the outcome of a great number of cases holding that release agreements may bar CERCLA claims—even if they predate the statute. *See, e.g., United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989) (holding release pre-dating CERCLA bars CERCLA claim); *FMC Corp.*, 668 F.Supp. at 1291–92 (holding same).

Nevertheless, I am satisfied that *AM International* correctly reads section 107(e)(1) as a general statutory rule forbidding the application of releases to bar CERCLA liability. This outcome is consistent with the statute's broad policies of encouraging cleanups and placing the burden of their costs on those responsible for hazardous waste problems. In addition, as

*AM International* carefully details, this result is consistent with the legislative history of section 107(e)(1), which shows

> Congress intended subsection 107(e)(1) to prevent the parties from contractually relieving themselves of liability under the act, whether that liability is enforced by action of the government or in a suit by a person who performed the clean-up and sues others for contribution under the act. In addition, by the second sentence, Congress intended to permit any person to contract with others not already liable under the act to provide additional liability by way of insurance or indemnity.

*Id.* at 529.

The Cordova defendants attempt to distinguish *AM International* as a case that pertains only to releases among private parties, rather than a release by a state agency in a consent order, as in this matter. I am not convinced that the circumstances of this case are different or that the clear meaning of section 107(e)(1) should be ignored in this instance. In essence, the release contained in the stipulation and consent order was part of a contractual arrangement between two parties at the culmination of negotiations over property. Therefore, the court concludes that MDNR's cross-claim against the Cordova defendants under section 107(a)(1) as present owners of the site contaminated by its previous owners is not barred by the stipulation and consent order.

In addition, the Cordova defendants contend that they are entitled to judgment in MDNR's cross-claim under section 107(a)(2) for alleged disposal that has occurred since Cordova/California's acquisition of the site. In this opinion and in the February 4 bench opinion, the court has noted evidence exists of the spread of groundwater contamination and the release of other hazardous substances since Cordova/California's acquisition of the site. Accordingly, the court concludes that MDNR's cross-claim under section 107(a)(2) for disposal that has occurred since Cordova/California's purchase of the site may proceed to trial.

■ The Cordova defendants also assert that the stipulation and consent order bars claims for contribution brought by other parties. Their argument is based on section 113(f)(2) of CERCLA, which states:

> A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement....

42 U.S.C. § 9613(f)(2). The Cordova defendants fail to cite any supporting cases protecting a party from contribution claims in a situation analogous to this case, but they argue that the stipulation and consent order shields them from contribution claims.

There are, however, a number of elements to section 113(f)(2) lacking in the Cordova defendants' position. Section 113(f)(2) clearly contemplates a settlement over *CERCLA* liability. At the time the consent order was signed, the Cordova defendants had no existing liability under CERCLA, which was not in existence itself. Indeed, the Cordova defendants had no liability for contamination at the site whatsoever at the time of the signing of the stipulation and consent order. The agreement actually attempted to address only Cordova/California's future obligations for cleanup activities at the facility it was acquiring. In addition, the stipulation and consent order fails to qualify as an "administrative or judicially approved" settlement, as required by section 113(f)(2). Although it was signed by officials of MDNR and the attorney general's office, the negotiation process was devoid of any hearings or public comment that might give rise to an argument that contribution claims should now be barred. Accordingly, I conclude that the stipulation and consent order does not bar any claims for contribution by other parties in this action.

## V. STATE CLAIMS

■ MDNR moves for summary judgment on a series of state law claims brought by the Cordova defendants based on the negotiations and stipulation and consent order dealing with the contamination

problems at the site. Specifically, MDNR contends it is entitled to judgment on claims of promissory estoppel, innocent misrepresentation, contractual damages and specific performance.

The claims for promissory estoppel, innocent misrepresentation, contractual damages and specific performance are based on alleged promises and agreements that MDNR made regarding the site's cleanup.

As the court discussed above, there are genuine issues of material fact regarding whether MDNR agreed to be responsible for remedying the groundwater contamination problem. In addition, other fact issues exist supporting the Cordova defendants' state claims, including evidence that MDNR misrepresented the magnitude of the pollution problems at the site and that the agency promised in the stipulation and consent order to release Cordova/California from any future liability for the preexisting contamination. I am satisfied that genuine issues of material fact exist that preclude judgment for MDNR on these state claims.

■ MDNR also asserts that it cannot be held liable for the Cordova defendants' response costs as contractual damages and that these contractual claims are barred by Michigan's six-year statute of limitations. MDNR says it lacked the constitutional and statutory authority to make any obligation for such reimbursements.

MDNR relies in part on article 9, section 18 of the Michigan Constitution, which prohibits the state from lending its credit: "The credit of the state shall not be granted to, nor in aid of any person, association or corporation, public or private, except as authorized in this constitution...." Mich. const. art. 9, sec. 18. This provision, however, has no bearing on the MDNR's alleged commitments to the Cordova defendant because they are based on the stipulation and consent order that involved a $600,000 payment to MDNR. Exchanges of value of this nature do not violate the Michigan Constitution. *See Advisory Opinion on Constitutionality of 1986 PA 281*, 430 Mich. 93, 422 N.W.2d 186 (1988);

*Alan v. Wayne County*, 388 Mich. 210, 200 N.W.2d 628 (Mich.1972).

■ MDNR also states that it lacked the statutory authority to incur contractual obligations in excess of the legislative appropriation it received for the cleanup at the site. MDNR cites M.C.L.A. § 18.1381, which provides: "A state agency shall not establish a new program or expand a current program, from any source of funds, above the level approved in the enacted budget...." This statutory provision did not become effective until 1985, however, so it does not affect the contractual obligations allegedly incurred by MDNR in 1977.

■ M.C.L.A. § 18.1381 replaced and repealed M.C.L.A. § 21.11, which was in effect at the time of the stipulation and consent order. The previous statute states, in part, that "no debt shall ... be contracted, or any financial obligation incurred" by any state office "in excess of the appropriation made by the legislature or authorized by law." This provision set caps on state funding. However, it does not appear that it would serve to bar the claims at issue here. MDNR clearly had authority to enter into a consent order setting forth obligations for cleanup at the site. The consent order purportedly limited Cordova/California's obligations for cleanup of past contamination at the site. It is this alleged agreement to release the Cordova defendants from further responsibility for the cleanup that provides the basis for Cordova defendants' contractual claims.

■ MDNR also claims that the six-year statute of limitations for breach of contract actions bars the Cordova defendants' contract claims. Because the stipulation and consent order was executed in 1977, MDNR contends, the statute of limitations had run by the time the Cordova defendants filed these claims in 1989. A breach of contract claim arises when a promise is broken, and it is this event that starts the statute-of-limitations clock. *Vandervies v. General Motors*, 130 Mich. App. 195, 201, 343 N.W.2d 4 (1983). I am satisfied, based on the evidence presently before the court, that the Cordova defen-

dants have adequately set forth evidence of breaches by MDNR in the six years preceding the filing of this action to overcome the statute of limitations bar at this time.

Accordingly, the court denies MDNR's motion for summary judgment against the Cordova defendants' state claims.

## VI. CONCLUSION

For the foregoing reasons, the court denies CPC's motion for summary judgment against MDNR, Aerojet, Cordova/California and Cordova/Michigan. The court denies Aerojet's motion for summary judgment with respect to CPC's section 107(a)(3) claim. The court denies MDNR's motion for summary judgment with respect to CPC's section 107(a)(3) claim and the state claims brought by Aerojet, Cordova/California and Cordova/Michigan. The court also denies the motion filed by Aerojet, Cordova/California and Cordova/Michigan for summary judgment against MDNR's cross-claim and all claims for contribution.