

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-27-1996

# USA v. CDMG Realty Co

Precedential or Non-Precedential:

Docket 95-5505

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"USA v. CDMG Realty Co" (1996). *1996 Decisions.* Paper 82.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/82

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES OF AMERICA

v.

CDMG REALTY CO., a limited partnership; HELEN E. RINGLIEB,
individually, and as general partner in CDMG REALTY CO.;
HMAT ASSOCIATES, INC.; TOWNSHIP OF PARSIPPANY-TROY HILLS;
ALLIED-SIGNAL, INC; BEAZER MATERIALS & SERVICES, INC.;
CIBA-GEIGY CORPORATION; HOECHST CELANESE CORP.; OCCIDENTAL
CHEMICAL CORP.; PFIZER, INC.; CARL GULICK, INC.; BECTON
DICKINSON, INC.; WARNER-LAMBERT COMPANY; AMERICAN TELEPHONE
AND TELEGRAPH COMPANY; BROWNING-FERRIS INDUSTRIES OF NORTH
JERSEY, INC.; INDUSTRIAL CIRCUITS COMPANY; AUTOMATIC SWITCH
COMPANY; ROWE INTERNATIONAL INC.; HOSOKAWA MICRON INTERNATIONAL
INC.; SCOVILL INC.; K-H CORPORATION ON BEHALF OF MAGOR CAR;
LESLIE CONTROLS COMPANY, INC.; NESOR ALLOY CORPORATION; SANDOZ
PHARMACEUTICALS CORPORATION; KIDDE INDUSTRIES, INC. (named
in the complaint as Hanson Industries); RAYONIER INC.,
(formerly ITT Rayonier, Inc.); WAGNER ELECTRIC CORPORATION
(named in the Complaint as Cooper Industries, Inc.); THE
SHERWIN-WILLIAMS COMPANY; KDI/TRIANGLE ELECTRONICS, INC.;
STATE OF NEW JERSEY DEPARTMENT OF TRANSPORTATION; JOHN DUSENBURY
COMPANY; SAFETY LIGHT CORPORATION, (named in the Complaint as USR
Industries, Inc.); THE BOC GROUP, INC.; L.E. CARPENTER & CO.;
THE MENNEN COMPANY; METEM CORPORATION; NSK CORPORATION; CERAMIC
MAGNETICS, INC.; AIR PRODUCTS & CHEMICALS, INC.; ROCKLAND
CORPORATION; SIKA CORPORATION; CARBONE USA CORPORATION;
NEW JERSEY TRANSIT CORPORATION; NEW JERSEY BUS OPERATIONS, INC.

v.

THE SHARKEY LANDFILL AGREEMENT GROUP, an organization of
Defendants in Civil Action Number 89-4246 (NHP), for
themselves and on behalf of other Settling Defendants whose
contribution claims they may assert pursuant to an
assignment of rights and HOECHST CELANESE CORPORATION, one of
its members; BEAZER MATERIALS & SERVICES, INC.; OCCIDENTAL
CHEMICAL
CORPORATION; HMAT ASSOCIATES, INC.,

                                    Third-Party Plaintiffs

v.

ADRON, INC.; AMERACE CORPORATION and SEQUA CORPORATION;
AIR PRODUCTS & CHEMICALS, INC.; BASIC, INC.; THE BOC GROUP, INC.;
CARBONE U.S.A. CORP.; CERAMIC MAGNETICS, INC.; COLLOID CHEMICAL,
INC.; COOPER INDUSTRIES, INC.; HANSON INDUSTRIES; INTERNATIONAL

ENGRAVING CORP.; INTERNATIONAL PAPER COMPANY; ITT RAYONIER, INC.;
JOHN DUSENBURY COMPANY, INC.; KDI/TRIANGLE ELECTRONICS INC.;
L.E. CARPENTER & CO.; LITTON SYSTEMS, INC.;
THE MENNEN COMPANY; METEM CORPORATION;
NEW JERSEY TRANSIT CORPORATION; NEW JERSEY TRANSIT BUS COMPANY,
INC.; NSK CORPORATION; OLD DEERFIELD FABRICS, INC.;
PANTASOTE INC.; PQ CORPORATION; PRECISION MANUFACTURING CO., INC;
ROCKLAND CORPORATION; SANDOZ PHARMACEUTICALS CORPORATION; THE
SHERWIN-WILLIAMS COMPANY; SIKA CORPORATION; USR INDUSTRIES, INC.
and TOWNSHIP OF BLOOMFIELD; TOWN OF BOONTON; TOWNSHIP OF BOONTON;
BOROUGH OF BUTLER; TOWNSHIP OF THE BOROUGH OF CALDWELL;
TOWNSHIP OF CHATHAM; CITY OF CLIFTON; TOWNSHIP OF DENVILLE;
TOWN OF DOVER; TOWNSHIP OF EAST HANOVER; COUNTY OF ESSEX;
TOWNSHIP OF FAIRFIELD; TOWNSHIP OF GLEN RIDGE BOROUGH;
BOROUGH OF HALEDON; TOWNSHIP OF HANOVER; CITY OF JERSEY CITY;
BOROUGH OF KINNELON; BOROUGH OF LINCOLN PARK;
TOWNSHIP OF LITTLE FALLS; TOWNSHIP OF LIVINGSTON; TOWNSHIP
OF MILLBURN; TOWNSHIP OF MINE HILL; TOWNSHIP OF MONTCLAIR;
TOWNSHIP OF MONTVILLE; TOWNSHIP OF MORRIS; TOWN OF MORRISTOWN;
BOROUGH OF MOUNTAIN LAKES; TOWNSHIP OF PEQUAMNOCK; BOROUGH OF
POMPTON LAKES; BOROUGH OF PROSPECT PARK; TOWNSHIP OF RANDOLPH;
BOROUGH OF RIVERDALE; TOWNSHIP OF ROCKAWAY; CITY OF SUMMIT;
BOROUGH OF TOTOWA; BOROUGH OF VICTORY GARDENS; TOWNSHIP OF WEST
CALDWELL; TOWNSHIP OF WEST ORANGE; BOROUGH OF WHARTON; VINCENT
APICE AND SON; FRANK M. BACE DISPOSAL, INC.; CALDWELL TRUCKING
CO., INC.; CARNER BROS., INC.; CENTRAL WASTE AND MILL SERVICE,
INC.; CHATHAM DISPOSAL COMPANY; CHEM-QUID DISPOSAL, INC.;
CARMEL CHIULLO; JOHN COSTA; JOSEPH DEFRIETAS; DELL & SONS;
DENVILLE DISPOSAL CO., INC.; DIMARCO SANITATION; SAM FIORENZO;
FRANK'S SANITATION SERVICE; GARBCO ASSOCIATES, INC.; B. HORSTMANN
SEPTIC TANK SERVICE; DANIEL JACKSON; J.M.S. SANITATION CO.;
R. LOBOSCO AND SONS, INC.; MARANGI SANITATION, INC.;
FRANK J. MARINARO; MERCER WASTE REMOVAL CO.;
ANTHONY MIELE; MORRIS COUNTY; WEST ESSEX DISPOSAL CO., INC.;
STATE OF NEW JERSEY DEPARTMENT OF TRANSPORTATION;
HELEN ELAINE RINGLIEB and TOWNSHIP OF ESSEX FELLS;
HARDING TOWNSHIP; MADISON BOROUGH;
BOROUGH OF NEW PROVIDENCE; ROSELAND BOROUGH; UNION COUNTY;
WAYNE TOWNSHIP; DOWEL ASSOCIATES, a general partnership;
HERBERT M. IRIS, individually and as a general partner in DOWEL
ASSOCIATES; LESTE Z. LIEBERMAN, individually and as general
partner in DOWEL ASSOCIATES,

Third-Party Defendants

(Newark N.J. D.C. Civil No. 89-cv-04246)


STATE OF NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION

   v.


CIBA-GEIGY CORPORATION, INC.; CURTISS-WRIGHT CORPORATION;
HOECHST-CELANESE CORPORATION; KETCHAM AND MC DOUGALL, INC.;

PFIZER, INC.; OCCIDENTAL PETROLEUM CORPORATION; KOPPERS
COMPANY, INC.; SHARKEY FARMS, INC.; NICHOLAS ENTERPRISES,
INC.; PARKER CHEMICAL COMPANY; CHEMICAL WASTE MANAGEMENT, INC.

(NEWARK N.J. D.C. Civil No. 89-cv-04281)

HMAT Associates, Inc., Appellant
_____

On Appeal From the United States District Court
For the District of New Jersey
_____

Argued: March 18, 1996

Before:  BECKER, McKEE, and McKAY,
                        Circuit Judges.

(Filed September 27, 1996)

JAMES J. PERICONI, ESQUIRE (ARGUED)
Periconi & Rothberg, P.C.
230 Park Avenue, Suite 615
New York, NY  19169

Attorneys for Third-Party Plaintiff/Appellant

R. BRUCE MORRISON, ESQUIRE
DAVID B. FARER, ESQUIRE (ARGUED)
JOHN P. QUIRKE, ESQUIRE
Farer Siegal Fersko
A Professional Association
600 South Avenue
P.O. Box 580
Westfield, NJ  07091

Attorneys for Third-Party Defendants/Appellees
_____

OPINION OF THE COURT
_____

BECKER, Circuit Judge.

This appeal requires us to determine the meaning of the word
"disposal" in the Comprehensive Environmental Response,
Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 et
seq.  Plaintiff HMAT Associates, the current owner of
contaminated property, was sued by the United States under CERCLA
for the costs of cleaning up the site.  HMAT sought contribution
from Defendant Dowel Associates, the company that sold the land
to HMAT, on the ground that Dowel was a prior owner "at the time
of disposal," see 42 U.S.C. § 9607(a)(2).  HMAT concedes that no

one dumped waste at the property during Dowel's ownership, but offers two reasons why "disposal" took place during Dowel's tenure. HMAT first advances a "passive" disposal theory: that "disposal" occurred because contamination dumped in the land prior to Dowel's purchase of the property spread during Dowel's ownership. HMAT also offers an "active" disposal theory: that a soil investigation conducted by Dowel to determine whether the land could support construction caused the dispersal of contaminants, and that this constitutes "disposal."

On cross-motions for summary judgment, the district court ruled in favor of Dowel. The court rejected HMAT's argument that the spread of contamination unaided by human conduct can confer CERCLA liability and held that any disturbance of contaminants caused by Dowel's soil testing was too insignificant to amount to "disposal." HMAT appeals the court's grant of Dowel's summary judgment motion and the denial of its own motion.

We hold that the passive migration of contamination dumped in the land prior to Dowel's ownership does not constitute disposal. Finding it unnecessary to reach the question whether the movement of contaminants unaided by human conduct can ever constitute "disposal," we conclude that the language of CERCLA's "disposal" definition cannot encompass the spreading of waste at issue here. This conclusion is based on an examination of CERCLA's text, is supported by the structure of the statute, and is consistent with CERCLA's purposes.

Regarding Dowel's soil testing, we hold that there is no threshold level of disturbance required to constitute "disposal," and that HMAT has identified evidence that would justify a factfinder's conclusion that contaminants were spread in the testing. We also hold, however, that because CERCLA clearly contemplates that prospective purchasers be allowed to conduct soil investigations to determine whether property is contaminated, a plaintiff must show not only that a soil investigation has caused the spread of contaminants, but also that the investigation was conducted negligently.

Thus, although we agree with the district court that HMAT's passive theory is not viable, HMAT may be able to proceed on its active theory. Accordingly, we will vacate the district court's grant of summary judgment to Dowel and remand for further proceedings consistent with this opinion.

## I. Facts and Procedural History

The property at issue in this case, a ten-acre parcel of land in Morris County, New Jersey, was once part of the Sharkey's Farm Landfill (Sharkey's Landfill). Sharkey's Landfill operated as a municipal landfill from 1945 until 1972. During its operation, the landfill received waste from several counties in northern New Jersey. In addition to accepting municipal solid waste, the landfill received approximately 750,000 pounds of hazardous chemical waste from Ciba-Geigy Company, a large pharmaceutical concern. Additional chemical waste from other sources may also have been deposited there. For example, Koppers Chemical Company allegedly disposed of about 3,000,000 gallons of wastewater of unknown composition in the landfill. Between 1966

and 1972, county and state agencies received steady complaints about odors, smoke from fires, lack of proper cover, and the presence of dead animals in the landfill. The landfill was closed to further disposal in 1972.

The Environmental Protection Agency (EPA) and the New Jersey Department of Environmental Protection and Energy (NJDEPE) began investigating Sharkey's Landfill in the mid to late 1970s. In 1982, the EPA placed Sharkey's Landfill on the National Priorities List of Hazardous Waste Sites.

In December 1981, Dowel purchased the property. The land was vacant at the time of purchase, and it remained vacant during Dowel's ownership. Neither Dowel nor any other person deposited waste at the site during Dowel's term of ownership. Dowel's only activity on the land was a soil investigation, conducted in September 1981 (three months prior to finalizing its purchase) to determine the land's ability to support construction. The soil investigation, which was performed by Thor Engineering, involved nine drill borings, each twelve to eighteen feet into the ground. Thor's logs show that its equipment bored through various waste materials and groundwater and that several of the boreholes "caved" during the testing. App. 120.

In November 1983, the NJDEPE notified Dowel that it was investigating the property and that Dowel should cease any planned activities at the site. In 1984, the EPA notified Dowel that Dowel was potentially liable for the cleanup costs of the site and invited it to undertake voluntary cleanup. App. 273.

In 1987, Dowel sold the property to HMAT. In the contract of sale, Dowel fully disclosed that the property was part of the Sharkey Landfill, that the landfill was under investigation by state and federal environmental authorities, and that the property was part of a possible Superfund site. App. 282.

In October 1989, EPA and NJDEPE commenced actions against parties potentially liable for the costs of cleaning up the Sharkey Landfill and seeking a declaration of future liability. HMAT, as the current owner of the property, was named as a defendant under CERCLA § 107(a)(1), 42 U.S.C. § 9607(a)(1). Dowel was not sued. However, HMAT filed a third-party suit against Dowel, seeking contribution from Dowel as a former owner of the property "at the time of disposal" pursuant to CERCLA §§ 107(a)(2) and 113(f). HMAT also pled state law claims.

Dowel moved for summary judgment, arguing that under CERCLA, prior owners are only liable if they actively engage in waste disposal during their ownership of the property. HMAT also moved for summary judgment. HMAT challenged Dowel's reading of CERCLA, contending that prior owners are liable if they fail to stop the migration of contaminants on their property. In addition, HMAT argued that Dowel actively engaged in waste disposal within the meaning of CERCLA: HMAT submitted an affidavit from Laura Truettner, an expert environmental consultant, which asserted that Dowel's drill borings exacerbated contamination by mixing, shifting, and spreading waste materials. In response, Dowel submitted an affidavit from Peter Wilner, the principal of Thor Engineering, stating that the boring did not spread or mix any materials. HMAT then submitted another affidavit from Truettner,

which contended that Wilner's affidavit contains misleading statements and directly contradicts the contemporaneous record of the drilling.

As we have noted, the district court granted Dowel's motion in full and denied HMAT's cross-motion. The court reasoned that mere ownership of previously contaminated property does not trigger liability under CERCLA, and that, even accepting HMAT's version of the facts, Dowel's drilling activities did not cause a significant enough disturbance to trigger liability. HMAT appeals the district court's rulings on its CERCLA claims (although it accepts the district court's conclusion that Dowel is not liable under state law). We exercise plenary review over the district court's summary judgment rulings. See, e.g., United States v. Capital Blue Cross, 992 F.2d 1270, 1271-72 (3d Cir. 1993).

## II. Passive Spreading in a Landfill as Disposal
### A. Introduction

CERCLA is a broad and complex statute aimed at the dangers posed by hazardous waste sites. Among other things, CERCLA provides a cause of action to recover "response costs" incurred in remedying an environmental hazard, 42 U.S.C. § 9607, and allows those liable for response costs to seek contribution from other liable parties, id. § 9613(f). A plaintiff must meet four elements to establish CERCLA liability: (1) that hazardous substances were disposed of at a "facility"; (2) that there has been a "release" or "threatened release" of hazardous substances from the facility into the environment; (3) that the release or threatened release has required or will require the expenditure of "response costs"; and (4) that the defendant falls within one of four categories of responsible parties. Id. § 9607(a); seeUnited States v. Alcan Aluminum Corp., 964 F.2d 252, 258-59 (3d Cir.), reh'g and reh'g in banc denied, 964 F.2d 271 (3d Cir. 1992). If these requirements are met, responsible parties are liable for response costs regardless of their intent. See id. at 259 ("CERCLA imposes strict liability on responsible parties.").

The parties agree that the first three requirements are met. Their dispute concerns whether Dowel is a responsible party. CERCLA makes four classes of people liable for response costs or contribution: the current owner or operator of a facility, id. § 9607(a)(1); any person who owned or operated the facility "at the time of disposal" of a hazardous substance, id. § 9607(a)(2); any person who arranged for disposal or treatment, or arranged for transport for disposal or treatment of hazardous substances at the facility, § 9607(a)(3); and any person who accepts or accepted hazardous substances for transport to sites selected by such person, Id. § 9607(a)(4). HMAT contends that Dowel is liable as a person who owned or operated the facility "at the time of disposal" of a hazardous substance.

CERCLA defines "disposal" by incorporating the definition used by the Resource Conservation and Recovery Act (RCRA). See42 U.S.C. § 9601(29) ("The terms 'disposal', 'hazardous waste', and 'treatment' shall have the meaning provided in section 1004 of the Solid Waste Disposal Act."). Under RCRA,

> The term "disposal" means the discharge, deposit,
> injection, dumping, spilling, leaking, or placing of
> any solid waste or hazardous waste into or on any land
> or water so that such solid waste or hazardous waste or
> any constituent thereof may enter the environment or be
> emitted into the air or discharged into any waters,
> including ground waters.

42 U.S.C. § 6903(3). Focusing on the breadth of this definition, HMAT reads "disposal" to encompass the passive migration of contaminants. HMAT offers no evidence that any passive migration has occurred here but asks us to take judicial notice that waste tends to spread once it is put in the ground, See Office of Remedial Response, United States Environmental Protection Agency, Superfund Exposure Assessment Manual 8 (1988) [Hereinafter Superfund Manual] (waste in landfills tends to migrate due to, inter alia, rain, groundwater movement, and wind) and waste therefore must have spread during the six years Dowel owned the property. Several courts have been sympathetic to this argument. See United States v. Waste Indus., Inc., 734 F.2d 159, 164–65 (4th Cir. 1984) (migration of hazardous substances can constitute disposal under RCRA); CPC International, Inc. v. Aerojet–General Corp., 759 F. Supp. 1269, 1278 (W.D. Mich. 1991) (the unchecked spread of contaminated groundwater qualifies as disposal under CERCLA); Stanley Works v. Snydergeneral Corp., 781 F. Supp. 659, 662–64 (E.D. Cal. 1990) (ongoing migration of hazardous substances constitutes disposal under CERCLA); United States v. Price, 523 F. Supp. 1055, 1071 (D.N.J. 1981) (spreading of hazardous substances constitutes disposal under RCRA), aff'd, 688 F.2d 204 (3d Cir. 1982); cf. Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 845–46 (4th Cir.) (leaking from tanks that were deposited prior to the defendants' ownership constitutes disposal subjecting the defendant to CERCLA liability), cert. denied sub nom. Mumaw v. Nurad, Inc., 506 U.S. 940 (1992); State of New York v. Almy Bros., Inc., 866 F. Supp. 668, 676–77 (N.D.N.Y. 1994) (gradual leaking from drums deposited prior to the defendants' ownership constitutes disposal under CERCLA); In re Hemingway Transport, Inc., 108 B.R. 378, 382 (Bankr. D. Mass. 1989) (leaking drums constitute CERCLA disposal), aff'd, 126 B.R. 650 (D. Mass. 1991), aff'd, 954 F.2d 1 (1st Cir. 1992).

We are unpersuaded. A thorough examination of the text and structure of CERCLA convinces us that the passive migration of contaminants alleged here does not constitute disposal. Our conclusion is based on the plain meaning of the words used in the disposal definition and is supported by the structure of CERCLA's liability scheme. We also believe that our interpretation is consistent with CERCLA's purposes.

### B. The Language
#### 1. The Definition of "Disposal"

The definition of disposal begins with "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water." 42 U.S.C. § 6903(3). Courts holding that passive migration can

constitute disposal have focused on the words "leaking" and "spilling," terms that generally do not denote active conduct. See CPC International, Inc. v. Aerojet–General Corp., 759 F. Supp. 1269, 1278 (W.D. Mich. 1991); United States v. Price, 523 F. Supp. 1055, 1071 (D.N.J. 1981), aff'd, 688 F.2d 204 (3d Cir. 1982).

We think there is a strong argument, however, that in the context of this definition, "leaking" and "spilling" should be read to require affirmative human action. Both "leaking" and "spilling" also have meanings that require some active human conduct. "Leak" can be defined as "to permit to enter or escape through a leak." Webster's Third New International Dictionary, Unabridged 1285 (Philip Babcock Gove & the Mirriam–Webster Editorial Staff eds., 1986) [hereinafter Webster's]. Similarly, "spill" can mean "to cause or allow to pour, splash, or fall out." Id. at 2195. Meaning derives from context, hence the constructional canon noscitur a sociis, which states that one may infer meaning by examining the surrounding words. The words surrounding "leaking" and "spilling" -- "discharge," "deposit," "injection," "dumping," and "placing" -- all envision a human actor. In the context of these other words, then, Congress may have intended active meanings of "leaking" and "spilling." SeeEcodyne Corp. v. Shah, 718 F. Supp. 1454, 1457 (N.D. Cal. 1989); Robert L. Bronston, Note, The Case Against Intermediate Owner Liability for Passive Migration of Hazardous Waste, 93 Mich. L. Rev. 609, 616 (1994).

But we need not address this question in the broad terms of whether disposal always requires active human conduct. Even if it does not, we conclude that the passive migration at issue in this case cannot constitute disposal. While "leaking" and "spilling" may not require affirmative human conduct, neither word denotes the gradual spreading of contamination alleged here. A common definition of "leak" -- and the one most favorable to HMAT -- is "to enter or escape through a hole, crevice, or other opening." Webster's, supra at 1285. This definition requires that a substance "leak" from some opening. For example, the definition would encompass the escape of waste through a hole in a drum. But HMAT has offered no evidence of leaking drums. Compare, e.g., Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 846 (4th Cir.) (the plaintiff presented evidence showing that tanks had leaked), cert. denied sub nom. Mumaw v. Nurad, Inc., 506 U.S. 940 (1992). And there is no other evidence that waste escaped from any opening during Dowel's ownership.

The definition of "spilling" is also unavailing. Although "spilling" too sometimes denotes the movement of liquid in the absence of human action, such a definition does not cover the spreading of waste at issue here. Passive definitions of "spill" suggest a rapid torrent, not gradual passive migration over the course of several years. See Webster's, supra at 2195 (defining "spill" as, inter alia, "to flow, run, or fall out, over, or off with waste, loss, or scattering as the result" and as "to come, go, or pass with a turbulent rush[; to] pour in an unrestrained, profuse, or disorderly manner"). Consider, for example, an "oil spill."

## 2. A Comparison With "Release"

It is especially unjustified to stretch the meanings of "leaking" and "spilling" to encompass the passive migration that generally occurs in landfills in view of the fact that another word used in CERCLA, "release," shows that Congress knew precisely how to refer to this spreading of waste. A prior owner who owned a waste site at the time of "disposal" is only liable in the event of a "release" or "threatened release." 42 U.S.C. § 9607. CERCLA defines release in relevant part as follows:

> The term "release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) . . . .

42 U.S.C. § 9601(22). The definition of "release" is thus broader than that of "disposal": "release" encompasses "disposing" and some elements of the "disposal" definition and also includes some additional terms.

Most importantly, the definition of "release" includes the term "leaching," which is not mentioned in the definition of "disposal." "Leaching" is "the process or an instance of separating the soluble components from some material by percolation." Webster's, supra at 1282. Leaching of contaminants from rain and groundwater movement is a principal cause of contaminant movement in landfills, see Superfund Manual, supra at 8, and is the most predominant cause of groundwater contamination from landfills, Edward Repa & Charles Kufs, Leachate Plume Management 2 (1985). The word "leaching" is commonly used in the environmental context to describe this migration of contaminants. See, e.g., Steven Ferrey, The Toxic Time Bomb: Municipal Liability for the Cleanup of Hazardous Waste, 57 Geo. Wash. L. Rev. 197, 207 n.34 (1988) ("Leachate is liquid or water soluble contaminated substances that migrate away from the point source of contamination in groundwater or surface water, often influenced by rain and normal water table activities. Such a phenomenon is described as 'leaching' of contaminants.") Congress's use of the term "leaching" in the definition of "release" demonstrates that it was aware of the concept of passive migration in landfills and that it knew how to explicitly refer to that concept.

. Yet Congress made prior owners liable only if they owned land at the time of "disposal," not at the time of "release."

## 3. "At the Time of Disposal"

Our conclusion that the meaning of the words in the "disposal" definition cannot cover the passive migration alleged in this case is buttressed by the language of CERCLA's liability provision. If the spreading of contaminants is constant, as HMAT would have us assume, characterizing liable parties as "any person who at the time of disposal . . . owned or operated any

facility," 42 U.S.C. § 9607(a)(2), would be a rather complicated way of making liable all people who owned or operated a facility after the introduction of waste into the facility. See Snediker Developers Ltd. Partnership v. Evans, 773 F. Supp. 984, 989 (E.D. Mich. 1991); Ecodyne Corp. v. Shah, 718 F. Supp. 1454, 1457 (N.D. Cal. 1989); In re Diamond Reo Trucks, Inc., 115 B.R. 559, 565 (Bankr. W.D. Mich. 1990). Furthermore, there would be no need for the separate responsible party category of current owner or operator, id. § 9607(a)(1). See Ecodyne Corp., 718 F. Supp. at 1457. Although CERCLA is not written with great clarity, we will not impute to Congress an intent to set up a simple liability scheme through a convoluted methodology.

### C. Structure: The Innocent Owner Defense

Our conclusion that the language of CERCLA's definition of "disposal" does not include the passive migration alleged here is also supported by a significant aspect of CERCLA's liability scheme, the innocent owner defense. Since the 1986 Superfund Amendments and Reauthorization Act (SARA), Pub. L. No. 99-499, 100 Stat. 1613 (1986) (codified at 42 U.S.C. §§ 9601-9675), CERCLA has exempted certain "innocent owners" from liability.

CERCLA provides a defense to liability if the defendant can prove that the release or threatened release was caused solely by an act or omission of a third party. 42 U.S.C. § 9607(b)(3). The defense is generally not available if the third party causing the release is in the chain of title with the defendant. See 42 U.S.C. § 9601(35)(A). However, the defense is available in such circumstances if the person claiming the defense is an "innocent owner." To establish the innocent owner defense the defendant must show that "the real property on which the facility is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility" and that "[a]t the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility."

Because CERCLA conditions the innocent owner defense on the defendant's having purchased the property "after the disposal" of hazardous waste at the property, "disposal" cannot constitute the allegedly constant spreading of contaminants. Otherwise, the defense would almost never apply, as there would generally be no point "after disposal." See United States v. Petersen Sand and Gravel, Inc., 806 F. Supp. 1346, 1351-52 (N.D. Ill. 1992); In re Diamond Reo Trucks, Inc. v. City of Lansing, 115 B.R. 559, 566 n.3 (Bankr. W.D. Mich. 1990); Bronston, supra at 627-28. We think it unlikely that Congress would create a basically useless defense.

The innocent owner defense's apparent limitation to current owners also supports the conclusion that "disposal" does not encompass the passive spreading alleged here. The provision establishing the innocent owner defense states: "Nothing in this paragraph or in section 9607(b)(3) of this title [, which provides the causation defenses including the third party defense,] shall diminish the liability of any previous owner or

operator who would be otherwise liable under this chapter."  42 U.S.C. § 9601(35)(C).  This language certainly suggests that the innocent owner defense is unavailable to prior owners or operators.

While the question whether the innocent owner defense is available only to present owners is not before us -- and we do not decide the issue -- we note that such a limitation makes sense only if passive spreading of waste in a landfill is not included in disposal.  If passive migration is excluded from "disposal," past owners will generally only be liable as owners "at the time of disposal" when they have committed or allowed affirmative acts of disposal on their property.  They would thus have little need for the innocent owner defense, which requires, inter alia, that a defendant did not "cause[] or contribute[] to the release or threatened release," 42 U.S.C. § 9601(35)(D); "exercised due care with respect to the hazardous substance concerned," id. § 9607(b)(3)(a); and "took precautions against foreseeable acts or omissions of any such third party [causing the release] and the consequences that could foreseeably result from such acts or omissions," id. § 9607(b)(3)(b).  On the other hand, if prior owners were liable because waste spread during their tenure and the innocent owner defense is available only to current owners, prior owners would be in a significantly worse position than current owners:  they would be liable for passive migration of waste even if they had no reason to know of the waste's presence.  We do not believe that this was Congress's intent.

## D. CERCLA's Purposes

We have explained our confidence that the meaning of the words defining "disposal" does not encompass the gradual spreading of waste in a landfill and that this conclusion is supported by the structure of the innocent owner defense.  We also conclude that this reading of "disposal" is consistent with CERCLA's purposes.

Congress enacted CERCLA with two principal goals in minds -- to facilitate the cleanup of potentially dangerous hazardous waste sites, Tippins Inc. v. USX Corp., 37 F.3d 87, 92 (3d Cir. 1994), and to force polluters to pay the costs associated with their pollution, United States v. Alcan Aluminum, 964 F.2d 252, 257-58 (3d Cir. 1992).  See United States v. USX Corp., 68 F.3d 811, 814 (3d Cir. 1995).  Our holding is clearly consistent with the latter purpose.  Those who owned previously contaminated property where waste spread without their aid cannot reasonably be characterized as "polluters"; excluding them from liability will not let those who cause the pollution off the hook.  And, many of these owners will pay for the pollution:  if they disclose the fact that the land contains waste, their selling price will reflect the cost of CERCLA liability.  If they have knowledge of contamination and do not disclose it to a transferee, they are liable for response costs even after the transfer.  42 U.S.C. § 9601(35)(C).  The only prior owners who will not pay any cleanup costs are those who bought and sold the land with no knowledge that the land is contaminated.

And our holding will not undermine the goal of facilitating the cleanup of potentially dangerous hazardous waste sites. Even if owners of previously contaminated land can evade liability by transferring the land, ample incentives remain to promote cleanup. See United States v. Petersen Sand and Gravel, Inc., 806 F. Supp. 1346, 1353 (N.D. Ill. 1992); Bronston, supra at 637–40. Present owners and operators remain strictly liable for the costs of cleanup, 42 U.S.C. § 9607(a)(1), as do some prior owners, id. § 9607(a)(2), people who arranged for disposal, id. § 9607(a)(3), and transporters of hazardous substances, id. § 9607(a)(4). Moreover, a number of provisions ensure that contamination will be discovered and the fact of contamination disclosed if the land is transferred. CERCLA imposes criminal liability (including prison sentences) for failure to report a "release" of hazardous substances above a certain threshold. See 42 U.S.C. § 9603. As mentioned, if an owner transfers land that it knows to be contaminated without disclosing the contamination, it remains liable even after the transfer. 42 U.S.C. § 9601(35)(C). In addition, the innocent owner defense encourages potential buyers to investigate the possibility of contamination before a purchase. See 42 U.S.C. § 9601(35)(B) (in order to claim the innocent owner defense, a defendant must have undertaken all appropriate inquiry).

Thus, for the reasons we have stated, we agree with the district court that HMAT cannot proceed on its "passive" theory of disposal: the movement of contaminants alleged here does not constitute "disposal." However, because we conclude that HMAT may proceed on its "active" theory of disposal, the issue to which we now turn, we will vacate the court's order granting summary judgment to Dowel on HMAT's CERCLA claim.

### III. Soil Investigation as Disposal

Having concluded that passive migration does not constitute disposal, we now consider HMAT's other asserted basis of liability. HMAT argues that Dowel's soil investigation, which was meant to determine the land's ability to support construction, caused the mixing, shifting, and spreading of contaminants and that this constitutes disposal. Although the district court suggested that HMAT's evidence of spreading was "speculative," it did not resolve whether the evidence was sufficient to allow a factfinder to conclude that the drilling caused any subsurface mixing. Instead, the court concluded that even accepting HMAT's version of events, Dowel's drilling "fell short of that conduct accepted as being enough of a disturbance to constitute disposal." According to the district court, only "significant disturbance of already contaminated soil constitutes disposal."

### A. No Threshold to Disposal

We disagree with the district court's reading of "disposal." Under 42 U.S.C. § 6903(3), "disposal" is defined in part as the "discharge" or "placing" of waste "into or on any land or water." "Disposal" thus includes not only the initial introduction of contaminants onto a property but also the spreading of

contaminants due to subsequent activity.  See Webster's, supra at 644 (defining "discharge" in part as "to set at liberty," "release from confinement, custody, or care," "pour forth," or "emit"); id. at 1727 (defining "place" in part as "cause to rest or lie"); Kaiser Aluminum & Chemical Corp. v. Catellus Development Corp., 976 F.2d 1338, 1342-43 (9th Cir. 1992) ("CERCLA's definition of 'disposal' expressly encompasses the 'placing of any . . . hazardous waste . . . on any land.'  42 U.S.C. § 6903(3).  Congress did not limit the term to the initial introduction of hazardous material onto property."); Tanglewood East Homeowners v. Charles-Thomas, Inc., 849 F.2d 1568, 1573 (5th Cir. 1988) ("[T]his definition of disposal does not limit disposal to a one-time occurrence -- there may be other disposals when hazardous substances are moved, dispersed, or released during landfill excavations and fillings.").

Although the cases cited above involved a greater disturbance of contaminants than that alleged here, the dispersal of contaminants need not reach a particular threshold level in order to constitute "disposal."  "Disposal" consists of "the discharge . . . or placing of any solid waste or hazardous waste into or on any land or water."  42 U.S.C. § 6903(3) (emphasis added).  There is no exception for de minimis disturbances.  Cf.United States v. Alcan Aluminum Corp., 964 F.2d 252, 260 (3d Cir. 1992) ("[C]ourts that have addressed this issue [whether the term "hazardous substance" includes any quantitative requirement] have almost uniformly held that CERCLA liability does not depend on the existence of a threshold quantity of a hazardous substance.").  The fact that a defendant's dispersal of contaminants is trivial may provide a ground to allocate less liability to that defendant, but it is not a defense to liability.

## B. The Evidence

The evidence presented by both parties shows that a genuine issue of material fact remains as to whether Dowel's drilling caused the dispersal of contaminants.  HMAT presented the drilling logs and report of Thor Engineering, the firm that performed Dowel's soil test.  According to these documents, Thor made nine drill borings twelve to eighteen feet into the ground and extracted columns of soil for study.  The drill bored through garbage, miscellaneous fill from the dump, cinders, a black substance that appeared to be petroleum-based, and ground water.  The documents show that al least three of the holes "caved" during drilling.  App. 120.

HMAT also submitted an affidavit from Laura Truettner, an expert environmental consultant, which asserted that Dowel's drilling spread contamination.  First, because Thor's logs show that the drill encountered waste materials, natural soil, and groundwater, and that several boreholes "caved," Truettner concludes that mixing of these materials occurred.  Second, Thor's report and logs show no evidence that the drilling equipment was decontaminated between boreholes and before the equipment was moved from the landfill.  Thus, Truettner maintains, it is probable that contaminated material was spread

between boreholes and along roads used for access by the drilling equipment.

Dowel, in response, submitted an affidavit from Peter Wilner, the principal of Thor Engineering. Wilner states that he personally directed and oversaw the drilling at issue. He asserts that "no drills were used; no 'cuttings' were generated; no soils or other materials were in any way spread around the premises; and no holes were left open, allowing for any infiltration of foreign materials." He also claims that "The 'open' boring method used for the . . . borings performed at the Premises does not cause the underground mixing or shifting of subsurface materials."

HMAT then submitted another affidavit from Truettner. Truettner contends that Wilner's affidavit contains misleading statements and directly contradicts the contemporaneous record of the drilling. She first casts doubt on Wilner's claim that he was present during the drilling, pointing out that the drilling logs indicate the presence of several people but make no mention of Wilner. She represents that it is industry practice to list all representatives at the site during the drilling.

Truettner then states that, although Wilner's statement that no drills were used is technically correct because a "split spoon sampler" was used, the distinction is irrelevant: materials were disturbed and a hole was created. According to Truettner, "anytype of sampling activity generates cuttings because the split spoon sampler knocks material off the borehole walls."

Furthermore, Truettner attacks the implications of Wilner's statement that no holes were left open. According to Truettner, in order for the holes to have been closed one of three things would have had to occur: (1) the holes were filled with material brought from off-site; (2) they were filled with material from the site itself; or (3) they were allowed to collapse in on themselves. Truettner contends that the first scenario is unlikely in light of the documentary evidence: the cost estimate of the drilling does not reflect the costs of fill material and labor. And, if either of the other two scenarios occurred, the act of filling the holes would cause mixing of materials on the property.

Finally, Truettner asserts that Wilner's statement that Thor's boring method does not cause mixing of subsurface of material is contradicted by the drilling logs, which show that at least three of the holes "caved." "The process of caving," Truettner states, "will absolutely cause the mixing and shifting of subsurface materials."

Given this evidence, a genuine dispute remains as to whether Dowel's drilling caused the dispersal of contaminants. A factual dispute is genuine if the evidence is such that a reasonable factfinder could find in favor the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). HMAT's evidence that Thor's equipment went through waste, soil, and groundwater and that several boreholes "caved", in combination with its expert's opinion, is sufficient to support a finding that a dispersal of contaminants occurred. Dowel's evidence, that despite the contact between its equipment, waste, soil, and

groundwater, its boring method caused no mixing, is sufficient to support the opposite finding. Thus summary judgment in favor of either party is inappropriate.

### C. Soil Investigation

As we have explained, HMAT has identified evidence from which a factfinder could conclude that Dowel has caused a dispersal of contaminants. Ordinarily, that would be sufficient to submit the question of whether a "disposal" occurred to a factfinder. However, this is not an ordinary case: the alleged act of disposal consists of a soil investigation, and CERCLA clearly contemplates that some soil investigation be allowed to examine contaminated property. Thus, it is not enough for a plaintiff to show that a soil investigation has caused the spread of contaminants. Rather, we conclude that in order to establish that "disposal" has occurred based on a soil investigation, a plaintiff must also show that the investigation was conducted negligently.

CERCLA's innocent owner defense encourages prospective property buyers to conduct soil investigations. The innocent owner defense requires, inter alia, that "[a]t the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility." 42 U.S.C. § 9601(35)(A)(i) (emphasis added). CERCLA provides explicit guidance on how a defendant is to establish that it had "no reason to know" of a prior disposal:

> To establish that the defendant had no reason to know . . . the defendant must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability. For purposes of the preceding sentence the court shall take into account any specialized knowledge or experience on the part of the defendant, the relationship of the purchase price to the value of the property if uncontaminated, commonly known or reasonably ascertainable information about the property, the obviousness of the presence or likely presence of contamination at the property, and the ability to detect such contamination by appropriate inspection.

Id. § 9601(35)(b). CERCLA thus contemplates that prospective purchasers "undertake[] . . . all appropriate inquiry" and will engage in "appropriate inspection."

In order to give effect to the innocent owner defense and its requirement that prospective purchasers engage in appropriate inquiry and inspection, an "appropriate" soil investigation cannot itself trigger CERCLA liability. Otherwise, prospective purchasers who by diligently inspecting for contamination cause the dispersal of any contaminants will find themselves liable for causing a "disposal." And the innocent owner defense would offer such prospective purchasers no protection: if they buy the property after discovering contamination, they will be ineligible

for the defense because they will not be "innocent" (i.e., they will "know and ha[ve] reason to know" of a prior disposal, id. § 9601(35)); if they do not buy the property, they will be ineligible for the defense because they will not be "owners" (i.e., they will not have "acquired the facility" as required by 42 U.S.C. § 9601(35)(A)). In order to give the defense effect, then, an "appropriate" soil investigation cannot constitute disposal.

But a party cannot escape liability for performing a soil investigation negligently and thereby unnecessarily spreading pollution. Several CERCLA provisions suggest that persons otherwise insulated from CERCLA liability may nonetheless become liable if they act negligently. In order to take advantage of a third-party defense (i.e., that a release was caused solely by a third party), a defendant must show that "he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances." 42 U.S.C. § 9607(b)(3)(a). And another provision, 42 U.S.C. § 9607(d)(1), insulates from liability actions consistent with the National Contingency Plan unless they are negligently performed:

> [N]o person shall be liable under this subchapter for costs or damages as a result of rendering care, assistance, or advice in accordance with the National Contingency Plan ("NCP") or at the direction of an onscene coordinator appointed under such a plan, with respect to an incident creating a danger to public health or welfare or the environment as a result of any releases of a hazardous substance or threat thereof. This paragraph shall not preclude liability for costs or damages as the result of negligence on the part of such person.

42 U.S.C. § 9697(D)(1). These provisions are themselves inapplicable to the issue at hand. However, they express a useful principle for determining when an action that is exempted from liability becomes so inconsistent with CERCLA's purposes that it is no longer so insulated, and this informs our judgment. We conclude that only "appropriate" soil investigations -- i.e., those that do not negligently spread contamination -- fall outside the definition of "disposal." Such a rule best harmonizes CERCLA's clear intention to allow soil investigations and its goal of remedying hazardous waste sites.

We recognize that the soil investigation at issue here was not meant to discover the presence of contamination but was aimed at assessing the land's ability to support construction. However, we conclude that the purpose of the investigation is irrelevant. Determining the motive of the investigating party seems a costly and difficult inquiry. Moreover, we do not wish to deter the productive use of property by discouraging soil investigations aimed at assessing development possibilities.

In addition to applying the wrong test of "disposal," the district court did not focus on whether Dowel's soil testing was negligently performed, and we believe that the parties should have a chance to add to the record on this issue. Therefore, we

will vacate the district court's order dismissing HMAT's CERCLA claim and remand for further proceedings.

## IV. Conclusion

For the foregoing reasons, the passive spreading of contamination in a landfill does not constitute "disposal" under CERCLA. Soil testing that disperses contaminants, however, may constitute "disposal" and HMAT has identified evidence that would justify a factfinder's conclusion that contaminants were dispersed in Dowel's testing. Nevertheless, because CERCLA contemplates that some soil investigation be allowed, HMAT must show not only that the soil investigation caused the spread of contaminants but also that the investigation was conducted negligently. The judgment of the district court will therefore be vacated and the case remanded for further proceedings consistent with this opinion.